THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES BAISTEN, Defendant-Appellant.

First District (2nd Division)   No. 1—87—2267

Opinion filed September 11, 1990.

Randolph N. Stone, Public Defender, of Chicago (James W. Younger, Jr., and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Marie Quinlivan Czech and Jeanette Sublett, Special Assistant State's Attorneys, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Charles Baisten, a black, appeals his jury conviction for murder on two grounds, alleging (1) that he was deprived of a fair and impartial trial when the circuit judge erroneously found under the standards set forth in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, that the State articulated legitimate, race-neutral reasons for exercising its peremptory challenges to exclude five black veniremen from the petit jury; and (2)—

that the State failed to prove defendant guilty of murder beyond a reasonable doubt.

THE FACTS

A jury consisting of nine white and three black persons convicted defendant of murder, resulting in his being sentenced to a term of 40 years in the custody of the Illinois Department of Corrections. A summary of the *voir dire* follows a review of the evidence.

TRIAL TESTIMONY

Alan Anderson (Anderson), 24, testified that at about 4 or 4:30 in the morning of August 2, 1986, he, the victim Darren Turner (Turner) and four other friends drove to the G & B Barbecue at 103rd and LaSalle Streets in Chicago to pick up a carry-out meal for Anderson's wife. They parked their car on the north side of 103rd Street, about 10 feet west of the barbecue stand. Anderson and Keith Beverly (Beverly) got out of the car and walked inside. Turner remained in the car with Clarence Cunningham (Cunningham), Darnell Smith (Smith) and Larry Jackson (Jackson). As he walked out of the stand with his food, Anderson noticed a crowd of approximately 30 people in the street, near the rear of his automobile, about 10 to 15 feet away from him. Lighting conditions in the street were good. Anderson then saw defendant, who was wearing a pair of blue jeans and no shirt, standing about 15 feet away from him against a lamp post, holding a gun in his right hand tightly against the back of his right thigh. After seeing the gun, Anderson touched Smith and Turner, who was standing about 10 feet away, closer to the south side of the street, and said "let's go." Then, having turned his back to Turner, Anderson heard a gunshot, "jumped" to the ground, and heard a second gunshot. He said the sounds came from the same direction in which only seconds earlier he had seen defendant standing with a gun.

Anderson saw Turner lying on the ground, wounded in the back of the head. He felt Turner's pulse, then ran to the barbecue stand to call for an ambulance and police, who arrived before Anderson came back out. About 10 minutes after the shooting, the police interviewed him on the scene. He did not see defendant again until defendant was arrested and placed in a paddy wagon. Soon after the interview, Anderson was taken to police area headquarters to view a lineup, where he identified defendant, now wearing a tank top, as the man he had seen holding a gun.

Cunningham, 24, essentially corroborated Anderson's testimony about the circumstances of the six friends arriving at the barbecue stand. He stated further that he remained in the car with Turner and Smith, while the others went inside. While they were waiting in the car, a woman named Lesa O'Neal (O'Neal), who according to Cunningham looked like a prostitute, walked past the car, eastbound on 103rd Street. Turner made some comments to her, then got out of the car and spoke to her again as they were walking. When O'Neal and Turner got to the corner, she walked across the street toward three men, spoke briefly to them, then walked back with them to where Turner was standing and slapped him across the face. In the meantime, Cunningham and Smith had gotten out of the car, and a fight broke out among O'Neal, Cunningham, Smith, Turner and the three other men. The fight then moved out into the street, where the number of people had grown to about 30 to 35. Cunningham kept hollering "let's go" to Smith and Turner, beckoning them to leave.

Cunningham then noticed defendant leaning against a stop sign pole on the corner, "looking kind of funny." The area was brightly illuminated by streetlights. Defendant was wearing gym shoes and a pair of jeans, but no shirt. His right arm was extended across his midsection, and with his left hand he held a black felt-like hat over his right hand, as if hiding something. Cunningham thought it might be a gun. At that time a man ran up to defendant and said, "Give me the gun, give me the gun." Defendant did not give him anything and a few seconds later the man left.

Cunningham turned and began running toward the barbecue stand to find Anderson. After taking about five steps he heard two gunshots. Turning back to the middle of 103rd Street where he heard the shots, he noticed Turner lying on the ground, wounded. Cunningham then ran to the barbecue stand to call an ambulance, which arrived with the police in about three or four minutes. While being interviewed by the police on the scene, Cunningham noticed defendant leaning against the same pole on the corner of 103rd and Perry Streets, about 10 feet away. He no longer held the hat and was wearing a dark green tank top. After Cunningham pointed him out, the police arrested him, finding the hat tucked under his belt. Cunningham later identified defendant at a lineup.

Dr. Tae An, a Cook County medical examiner, performed an autopsy on the victim and determined that he died from a gunshot wound to the head.

Chicago police officer Stan Salabura came to the scene of the

shooting in response to a radio call and was told by Officer Neal that a man and a woman who were involved in the incident were walking away eastbound on 103rd Street. The woman, O'Neal, broke and tried running away but was later apprehended in a gangway. She told Officer Salabura that defendant was the one who fired the gun which killed Turner. Officer Salabura also interviewed Cunningham, whose identification of defendant on the scene led to defendant's arrest.

Chicago police detective William Storck testified that he also arrived at the scene in response to a radio call. He saw O'Neal sitting in a police car with Officer Salabura. She beckoned him to come over. Officer Storck then took her into his unmarked police car and had a conversation with her. After talking to her, he sent two flash messages over his radio about the offender, then five minutes later noticed defendant in a police wagon on the scene.

Chicago police officer Reynard James Ricks, assigned to the crime laboratory, administered a gunshot residue test on defendant at area headquarters approximately three hours after the shooting. Defendant did not tell him whether he was right or left handed, but stated that he had last washed his hands sometime the day before.

Chicago police officer Raymond Lenz, also assigned to the crime laboratory, was qualified as an expert in the field of forensic microanalysis. He performed several tests on the samples taken from defendant's hands and determined that the backs and palms of his hands had high levels of lead, barium and antimony. In Officer Lenz's opinion, the very high level of these elements indicated that defendant had either fired a weapon or handled a recently fired weapon before the test. It was also his opinion that according to the test results it was more likely that defendant had fired the weapon himself rather than having handled one after someone else had fired it. On cross-examination, Officer Lenz acknowledged that similarly high levels of the elements may be found on the hands of a person who either works in a foundry machine shop or has handled gasoline.

Chicago police officer James Lotito testified for the defense. On the night of the shooting, he conducted a lineup viewed by Anderson, Smith and Cunningham. At the lineup Cunningham told him that someone walked up to defendant shortly before the shots were fired and said "give it to me, give it to me."

Iva Brown testified that on the night of the shooting she was with defendant inside the G & B Barbecue when they heard shots being fired across the street. On that night, according to her,

defendant was wearing striped pants, a white T-shirt and a baseball cap.

John Carpenter, 69, who lived on the corner of 103rd and Perry Streets, testified that he was sitting on his front porch in the early morning hours of August 2, 1986, when he heard two shots fired. He walked down to the corner and saw Turner's body lying on the pavement. While Carpenter was talking to a neighbor, he noticed defendant standing nearby for a while, but did not see from which direction he had come. Shortly thereafter he saw the police place defendant under arrest.

### THE *VOIR DIRE* AND *BATSON* HEARING

The record on appeal indicates that before trial, the trial judge individually questioned approximately 40 prospective jurors. Of the 12 jurors who were finally impanelled, three were black; the two alternates were also black. Nine prospective jurors were excused for cause. The State and defendant each exercised seven peremptory challenges. Six of these seven challenges were used by the State to excuse blacks; Jerry Brown, Marie Douyon, Maxine Johnson, Regina Little, Anita Harrell and Walter Thornton. The record on appeal does not indicate either the racial composition of the venire, the race of the nine jurors excused for cause, the identity of the three black jurors or the order in which the parties exercised their peremptory challenges and challenges for cause.

After the circuit judge summarized the challenges exercised by both sides, the following colloquy took place between the judge and counsel for the defense:

"THE COURT: I am going to put it out now, I have heard no motion for inquiry under Batson and unless as I understand it there is a waiver, if that is not brought up now, if it is not waived—.

MR. CUDA [Defense Attorney]: Waiver of what?

THE COURT: Batson. I have heard no motion concerning Batson.

MR. CUDA: Is that the systematic exclusion of all blacks?

THE COURT: Right.

MR. CUDA: I will raise it just for the record, Judge.

THE COURT: All right.

MR. CUDA: I think my recollection that the State excluded 6 out of 7 challenges were black.

THE COURT: That is true. I am going to find on that basis as to some of them at least there does not appear to be

any reason. I am going to ask the State to enunciate a reason. I understand as to Jerry Brown, you asked for cause because of his rap sheet indicated prior arrests, no convictions and he didn't say so on his sheet. I think that is a legitimate reason for exercising a peremptory."

Following is a summary of the *voir dire* examination of each of the five other black prospective jurors, a statement of the prosecution's reasons for excusing them and the court's response.

(1) *Anita Harrell.* Ms. Harrell indicated she is single, living in a rented apartment and currently unemployed, but worked in the post office for 11 years in the past. She does not subscribe to any books, magazines or periodicals, but is active in her church, holds office in the church choir and enjoys baseball as a hobby. She also said she would be able to follow the jury instructions and could be fair and impartial.

The prosecutor explained that Ms. Harrell failed to provide answers to a number of questions on her jury summons card, including questions regarding her employment and present occupation. Moreover, certain answers she imparted to the court during the *voir dire* were either not noted on the card or did not correspond to the information thereon.

The judge found that this was a neutral explanation because it went to Ms. Harrell's competency to sit as a juror.

(2) *Regina Little.* Ms. Little indicated she is a divorced housewife currently studying for a GED in order to earn a degree in nursing and lives in an apartment. She has two children, a son in Iowa "doing ten years" and a married daughter. She subscribes to two nursing periodicals, is not active in any organizations and could be fair and impartial.

The prosecutor stated that the State excused Ms. Little because she has two children of about the same age as defendant.

The judge noted that historically this has been a legitimate reason for exercising a peremptory challenge.

(3) *Walter Thornton.* Mr. Thornton stated that he is married, with two children in grammar school, and lives in an apartment. He is currently employed with a company that services airlines and has worked as a scavenger truck driver and as an employee of a custom car shop in the past. His wife is a nurse's aide. Mr. Thornton enjoys basketball and baseball, does not subscribe to any books, magazines or periodicals and is not active in any organizations. He stated he could follow the court's instructions and be a fair and impartial juror.

The prosecutor said Mr. Thornton was excused because he "showed more interest in what the defendant was doing than the questions the court was asking." Also, he was close in age to defendant.

The judge observed that indeed Mr. Thornton was not looking at him except when questioned. According to the judge, the State's reason was "very subjective" but "not frivolous because those are things that in the selection process one looks for and it is a non-racial reason."

(4) *Maxine Johnson*. Ms. Johnson stated that she is single, rents an apartment and has worked as a cashier for the past seven years. She does not subscribe to any reading materials, enjoys shopping, is active in church but does not hold any office, and could be fair and impartial.

The prosecutor stated that the information Ms. Johnson provided both on her card and during questioning did not give the State "an adequate basis as to what this person was thinking about or what position she held." Furthermore, she was approximately the same age as one of the State's prospective witnesses, O'Neal, a black woman who was involved in a confrontation on the street with one of the victim's friends.

With respect to the State's first reason for excluding Ms. Johnson, the judge found that it was "thin" but nevertheless neutral. He offered no comment regarding the second reason.

(5) *Marie Douyon*. Ms. Douyon told the court she is married, has no children and has lived in her home at 89th and Yates Streets in Chicago for the past 12 years. She is a nurse's aide in Provident Hospital; her husband works with computers at the Federal Reserve Bank in Chicago. Her hobby is music, she reads no books or magazines and is not active in any organizations. She indicated she could follow the jury instructions and be fair and impartial.

The prosecutor explained that the State excused Ms. Douyon because she lives near the area where the crime in question occurred, and because her familiarity with that neighborhood may cause her to prejudge the characteristics of some of the witnesses.

The judge observed that a juror who lives close to the scene of the crime may overhear certain things about the case in the neighborhood that are hearsay. He also agreed with the State that such a juror may infer certain characteristics about the witnesses merely because of where they reside. He found that the State's explanations were neutral and nonracial.

After hearing arguments from both sides with respect to each

of the five excused jurors, the trial judge concluded that all of the State's reasons were race neutral and that therefore there had been no systematic exclusion of blacks from the jury.

REVIEW OF THE *BATSON* HEARING

■■ ■ Defendant argues that by exercising six out of seven peremptory challenges against black members of the venire, the State denied him his right to equal protection under the fourteenth amendment to the United States Constitution.[1] In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Court held that a prosecutor's purposeful use of peremptory challenges to exclude members of a cognizable racial group from a jury in a criminal case violates the right to equal protection of a defendant who is a member of that racial group. In the two-part analysis delineated by the Court for determining whether a violation of such right has occurred, defendant bears the initial burden of establishing a *prima facie* case of purposeful discrimination. As stated in *Batson:*

> "To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor

---

[1]Relying on Justice Simon's dissenting opinion in *People v. Payne* (1983), 99 Ill. 2d 135, 144-51, 457 N.E.2d 1202, 1206-10, defendant maintains that the sixth amendment to the United States Constitution, which guarantees defendants the right to be tried by a fair cross-section of the community, also bars the use of peremptory challenges to exclude members of distinct racial groups from the petit jury. The Supreme Court definitively foreclosed this argument in *Holland v. Illinois* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803. Affirming the Illinois Supreme Court's decision, it held that the fair-cross-section requirement of the sixth amendment applies only to the racial composition of the venire, because its extension to the petit jury would cripple the peremptory challenge device which permits both the prosecution and the defense to actively participate in the selection of a fair and impartial jury. In *Holland*, the defendant, who was white, objected to the State's peremptory exclusion of two black venire members from the petit jury. To date, the Illinois Supreme Court has not allowed such an extension of defendants' rights under the State Constitution.

used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors *** raises the necessary inference of purposeful discrimination." (476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.)

Once the defendant makes the requisite showing, the burden shifts to the prosecution to articulate legitimate, race-neutral and trial-specific explanations for its use of the peremptory challenges. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.

## WHETHER DEFENDANT MADE OUT A *PRIMA FACIE* CASE

■ It is not disputed that defendant satisfied the threshold requirement of the *Batson* analysis: the record reflects that defendant is black and that the State used six of its seven peremptory challenges to exclude blacks from the jury. However, since the trial court's determination of whether defendant made out a *prima facie* case of purposeful discrimination does not turn on an evaluation of credibility, but rather "depends upon a weighing of the 'relevant circumstances' of the case" (*People v. Holman* (1989), 132 Ill. 2d 128, 173, 547 N.E.2d 124, 144, *cert. denied* (1990), ___ U.S. ___, 111 L. Ed. 2d 804, 110 S. Ct. 3296), the number of blacks may not be the sole consideration (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172, 1184, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203; *People v. Young* (1989), 128 Ill. 2d 1, 19-20, 538 N.E.2d 453, 457, *cert. denied* (1990), ___ U.S. ___, 111 L. Ed. 2d 798, 110 S. Ct. 3290; *People v. Evans* (1988), 125 Ill. 2d 50, 64, 530 N.E.2d 1360, *cert. denied* (1989), 490 U.S. 1113, 104 L. Ed. 2d 1036, 109 S. Ct. 3175). In fact, our supreme court "has repeatedly emphasized that in determining whether a *prima facie* case of discrimination exists, a 'court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged'" (*Holman*, 132 Ill. 2d at 172, 547 N.E.2d at 142, quoting *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184), but should focus instead on the "relevant circumstances" tending to raise an inference of purposeful discrimination (*Holman*, 132 Ill. 2d at 172-73, 547 N.E.2d at 143). In *Batson*, the Supreme Court gave two illustrations of such circumstances: a "pattern" of strikes against black veniremen and the prosecutors' questions and statements during the jury selection process. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) In the course of developing the law pursuant to *Batson* in Illinois, our supreme court has recognized a number of other relevant considerations. See *Holman*, 132

Ill. 2d at 173, 547 N.E.2d at 143 (prosecutor's conduct in previous cases); *Mahaffey*, 128 Ill. 2d at 413, 539 N.E.2d at 1184 (disproportionate number of peremptory challenges used against blacks; fact that excluded blacks constitute an otherwise heterogenous group; proportion of blacks in venire as compared to their proportion on jury; race of defendant and victim; race of witnesses); see also *People v. Hooper* (1989), 133 Ill. 2d 469, 503-04, 552 N.E.2d 684, 698; *Evans*, 125 Ill. 2d at 63-64, 530 N.E.2d at 1365.

Relying on the foregoing principles, the State contends on review that the trial judge determined whether defendant established a *prima facie* case of purposeful discrimination only after inviting the State to come forth with race-neutral explanations for the peremptory challenges it exercised against blacks. Hence, according to the State, the ensuring hearing was a "consolidated hearing" akin to those conducted in *People v. Brisbon* (1989), 129 Ill. 2d 200, 544 N.E.2d 297, *cert. denied* (1990), 494 U.S. 1074, 108 L. Ed. 2d 797, 110 S. Ct. 1796, and *Hooper*, where the trial court "considered the entire record, as well as the prosecutor's explanations, in deciding [whether] a *prima facie* case of discrimination" had been established (*Brisbon*, 129 Ill. 2d at 231, 544 N.E.2d at 312); therefore, the trial court's ultimate finding in our case was that defendant failed to meet his burden. The State argues in the alternative that the trial judge implicitly found an inference of purposeful discrimination based on the mere number of blacks excluded from the petit jury when, in response to defense counsel's statement that the prosecution exercised six out of seven peremptory challenges against blacks, the judge stated: "I am going to find on that basis as to some of them at least there does not appear to be any reason. I am going to ask the State to enunciate a reason." Citing *Evans* and *Mahaffey*, the State urges that since mere numbers alone are not sufficient to state a *prima facie* case, we should find that defendant failed to meet his burden in this instance also.

In resolving this issue we are mindful of the supreme court's recent admonishment to our trial courts to preserve the integrity of *Batson's* analytical framework by first evaluating defendant's *prima facie* case and only then permitting the State to articulate race-neutral explanations. (*People v. Hope* (1990), 137 Ill. 2d 430, 452-62.) If the procedure were inverted,

> "not only would a defendant's *Batson*-conferred ability to make such a case be impaired in the first place, but also it is likely that the explanations themselves would be judged less rigorously than if they had to measure up to *Batson* stand-

ards of specificity and neutrality in order to meet a *prima facie* case already established." (*Hope*, 137 Ill. 2d at 456-57.)

The court distinguished *Brisbon* and *Hooper*, wherein the trial court held "consolidated hearings," rejecting "any general rule that *post hoc* State explanations may be permitted to act as a thumb on the scales while a defendant's own *prima facie* case is being weighed to see whether such explanations will even be required." *Hope*, 137 Ill. 2d at 459.

■ Turning to the case at bar, however, it is evident from the trial judge's final decision that he did not hold a "consolidated hearing." In concluding the *Batson* hearing, the judge stated:

"I have determined from the State and also [from] the statements concerning their neutral reasons that there has not been a systematic exclusion of the black race in the selection of this jury by the exclusion of 6 or 7 jurors."

Clearly, the judge heard the prosecutor's explanations for the purpose of determining whether the State overcame defendant's *prima facie* case. Thus we need not address whether the judge improperly considered those explanations in determining whether defendant stated a *prima facie* case in the first place.

Although, in light of *Young, Mahaffey* and *Holman*, we do not approve of the trial judge's implicit finding of a *prima facie* case exclusively on the basis of the number of blacks peremptorily excluded by the State, we will not disturb that finding and invoke instead the "presumption that, because explanations were requested, a *prima facie* case [was] made." (*Hope*, 137 Ill. 2d at 460, citing *People v. Johnson* (1989), 47 Cal. 3d 1194, 1217, 767 P.2d 1047, 1054, 255 Cal. Rptr. 569, 576, *cert. denied* (1990), ___ U.S. ___, 108 L. Ed. 2d 636, 110 S. Ct. 1501; *State v. Gonzalez* (1988), 206 Conn. 391, 397, 538 A.2d 210, 213; *State v. Walton* (1988), 227 Neb. 559, 562, 418 N.W.2d 589, 591.) Since the only *Batson* issue on appeal is whether the State came forward with genuine, case-specific and racially neutral explanations, we have no reason to scrutinize whether indeed defendant met his burden of establishing an inference of purposeful discrimination. Thus we proceed directly to review the trial judge's assessment of the rebuttal evidence proffered by the State.

## THE STATE'S REBUTTAL

■ Defendant contends that the trial court erred in finding that the State articulated legitimate, race-neutral reasons for exercising six out of seven peremptory challenges to exclude blacks

from the petit jury. Under *Batson*, the State has the burden "to 'articulate' ' "clear and reasonably specific" explanation[s]' for its use of peremptory challenges on minority venirepersons." (*People v. Harris* (1989), 129 Ill. 2d 123, 184, 544 N.E.2d 357, 384, quoting *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88-89 & n.20, 106 S. Ct. at 1723-24 & n.20, *cert. denied* (1990), 494 U.S. 1018, 108 L. Ed. 2d 498, 110 S. Ct. 1323.) The State's explanations need not rise to the level necessary to justify a challenge for cause; however, they must be more than mere assertions of good faith or lack of discriminatory motive. (*Harris*, 129 Ill. 2d at 174, 544 N.E.2d at 379, citing *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) In particular, the State may not justify the exclusion of black venirepersons solely by reason of their sympathy toward a black defendant on account of their shared race. *Harris*, 129 Ill. 2d at 174, 544 N.E.2d at 379, citing *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

 The trial court must then evaluate the State's explanations to determine whether they are sufficient to rebut defendant's *prima facie* case. In doing so, the trial court must make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanations in light of the circumstances of the case.' " (*Harris*, 129 Ill. 2d at 174-75, 544 N.E.2d at 380, quoting *People v. Hall* (1983), 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75.) The judge has a twofold responsibility: to assess the genuineness of the prosecutor's assertions and to determine whether those assertions are indeed legitimate and race neutral. (*People v. Mack* (1989), 128 Ill. 2d 231, 238-39, 538 N.E.2d 1107, 1111, *cert. denied* (1990), 493 U.S. 1093, 107 L. Ed. 2d 1072, 110 S. Ct. 1170.) Whether the State has met its burden is a question of fact, turning largely on credibility; thus, the trial judge's determination is entitled to "great deference" and will not be disturbed on review unless it is against the manifest weight of the evidence. (*Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380, citing *People v. McDonald* (1988), 125 Ill. 2d 182, 199, 530 N.E.2d 1351, 1358.) If it becomes apparent that the State excluded even one venireperson on the basis of race, it is enough to reverse defendant's conviction. (*Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380, citing *McDonald*, 125 Ill. 2d at 200-01, 530 N.E.2d at 1359.) Thus, we must review the State's proferred explanations for each of the five black members of the venire whose exclusion defendant contests.

With respect to three excluded black venirepersons, Ms. Harrell, Ms. Little and Mr. Thornton, defendant maintains that the

State exhibited a patent inconsistency in its treatment of black and white venirepersons by accepting white jurors possessing the same characteristics for which it excluded these three black members of the venire. In *McDonald* (125 Ill. 2d 182, 530 N.E.2d 1351), the supreme court affirmed the trial court's finding that the State engaged in purposeful discrimination because all of the excluded blacks who testified at the *Batson* hearing were excluded on the basis of certain traits which the white jurors who were accepted also possessed. For example, the State excluded a 34-year-old black male, because single males are the "worst jurors" for rape cases, but retained a single 18-year-old white male. (125 Ill. 2d at 199, 530 N.E.2d at 1358.) The State also excluded a black female who had been on jury duty but may or may not have served on a jury, because individuals with prior jury service may have preconceived notions about a case and are "time bombs in a case waiting to happen," but retained a white female who had served on two previous juries. 125 Ill. 2d at 199, 530 N.E.2d at 1359.

Defendant points out that in the present case, the State excluded Ms. Harrell because she failed to fill out the answers on her summons card to several questions, including her age, employer's name, occupation, number of children and work telephone number. However, the State retained R.L. and B.C., two allegedly white jurors, who also left certain questions blank. The State then excluded Ms. Little, because she stated that she has two children, ages 23 and 25, both of whom are of a similar age to defendant, who is 25; however, J.R., an allegedly white juror, was retained despite the fact that she has three children, ages 20, 25 and 29. Finally, the State excluded Mr. Thornton, 31, because he was close in age to defendant, whereas B.C. and J.H., two allegedly white jurors, both age 29, were allowed to remain on the jury.

While this kind of an argument should "be given great weight" (*Harris*, 129 Ill. 2d at 180, 544 N.E.2d at 382) and "should not be lightly dismissed" (*Young*, 128 Ill. 2d at 23, 538 N.E.2d at 458) when evaluating the credibility of the State's proferred explanations, we cannot agree with defendant's position because, as the State correctly asserts, the record before us is devoid of any showing that the jurors who defendant claims are white in his brief are indeed white. Since a reviewing court is "plainly entitled" to consider defense counsel's statements spoken at a *Batson* hearing to identify the race of excluded venirepersons (*People v. Andrews* (1989), 132 Ill. 2d 451, 461, 548 N.E.2d 1025, 1029, quoting *McDonald*, 125 Ill. 2d at 198, 530 N.E.2d at 1358), we see no reason

why the same would not be true for the purpose of identifying the white members of the jury. However, in our case, the only references to the race of four allegedly white jurors appear only in defendant's appellate brief. Accordingly, we consider that defendant has waived his arguments concerning the State's disparate treatment of black and white venirepersons. Defendant's challenge to the court's finding that the State articulated legitimate, specific and racially neutral reasons for excluding black members of the venire remains viable on all other grounds, however; thus, we now turn to the individual challenges exercised by the State.

■■ (1) *Ms. Harrell.* As the State accurately notes, no impanelled juror left as many questions blank on the jury summons card as Ms. Harrell; and certain answers she gave during the *voir dire* did not correspond to the information on her card. The record reflects that she failed to answer 8 out of 21 questions. Thus, we agree with the trial judge's conclusion that the State's explanation was race neutral and related to Ms. Harrell's competency to sit as a juror.

(2) *Ms. Little.* The State may legitimately exercise a peremptory challenge to exclude a prospective juror who has children of an age similar to defendant's. (*People v. Allen* (1987), 168 Ill. App. 3d 397, 405, 521 N.E.2d 1172, 1176, citing *Johnson v. State* (Okla. Crim. App. 1987), 731 P.2d 993, 999 n.3, *cert. denied* (1987), 484 U.S. 878, 98 L. Ed. 2d 167, 108 S. Ct. 35.) According to the State's proffered explanations, Ms. Little was excluded because she has a son and a daughter, ages 23 and 25. Although the record also reflects that during the *voir dire* she stated that her son is "doing ten years" in Iowa, an otherwise legitimate and race-neutral basis for exclusion (*Allen*, 168 Ill. App. 3d at 405, 521 N.E.2d at 1176, citing *Johnson*, 731 P.2d at 999 n.3), we may not consider his criminal record in this case because the prosecution did not articulate it as an explanation, and the court did not rule upon it. *Harris*, 129 Ill. 2d at 184-85, 187-88, 544 N.E.2d at 384, 385-86.

(3) *Mr. Thornton.* As we have noted earlier, the State excluded Mr. Thornton because at age 31, he was close in age to defendant and because during the *voir dire* he continued looking at defendant, while avoiding looking at the judge. The fact that a prospective juror is similar in age to the defendant is a legitimate, specific, race-neutral reason for exclusion. (*Hope*, 137 Ill. 2d at 459-60.) However, even if we discount this reason, we are still left with Mr. Thornton's demeanor, which concerned both the prosecutor and the judge. The demeanor of a prospective juror, or his outward manner

or bearing, "has anciently been regarded as being of significance" and "has traditionally been a factor of importance in jury selection." (*Young*, 128 Ill. 2d at 20, 538 N.E.2d at 457; *Mack*, 128 Ill. 2d at 239-40, 548 N.E.2d at 1112.) Also, "a peremptory challenge traditionally could be based on no more than ' " 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another.' " ' " (*Young*, 128 Ill. 2d at 22, 538 N.E.2d at 458, quoting *Batson*, 476 U.S. at 135, 90 L. Ed. 2d at 113, 106 S. Ct. at 1743 (Rehnquist, J., dissenting).) Although as the *Young* court stated, there is appeal to the contention that a prosecutor's citation of demeanor can easily be used as a subterfuge for racially motivated exclusions, the trial judge is in the best position not only to observe the behavior of the prospective juror, but also to evaluate the prosecutor's sincerity; thus " 'a reviewing court ordinarily should give [the judge's] findings great deference.' " (*Young*, 128 Ill. 2d at 21, 538 N.E.2d at 457, quoting *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) In the present case, the trial judge felt that indeed Mr. Thornton avoided looking at him except when directly questioned and found that, albeit subjective, the prosecutor's reason for excluding him was legitimate and racially neutral. In our opinion, this finding cannot be said to be against the manifest weight of the evidence.

(4) *Ms. Johnson.* The State peremptorily challenged Ms. Johnson because the State did not feel it had enough information about her to make an educated decision to accept her. Such explanations "should be closely scrutinized since they can be easily utilized as a pretext for discriminatory challenges." (*Harris*, 129 Ill. 2d at 188, 544 N.E.2d at 386.) When evaluating such explanations, a reviewing court "should consider whether the State made any attempt at discovering the unknown information [citation] by, for example, requesting that supplemental questions be asked during *voir dire* [citation]." (*Harris*, 129 Ill. 2d at 188, 544 N.E.2d at 386.) At the *Batson* hearing, defense counsel brought to the judge's attention the fact that the prosecutors had an opportunity to ask additional questions, but did not do so. In response, the judge reiterated his conclusion that the State's reason was legitimate and race neutral. Upon review, keeping in mind that prosecutorial explanations for the exercise of peremptory challenges need not rise to the level necessary for exclusions for cause (*Harris*, 129 Ill. 2d 123, 544 N.E.2d 357) and that the trial court's findings of those explanations depend extensively on the judge's evaluation of the prosecutor's credibility (*McDonald*, 125 Ill. 2d 182, 530 N.E.2d 1351), we cannot

say with any degree of confidence that the judge's finding was contrary to the evidence. Because the trial court did not make any specific finding with respect to a second proffered explanation, that Ms. Johnson was close in age to one of the State's witnesses, Lesa O'Neal, we may not consider it on appeal. *Harris*, 129 Ill. 2d at 185, 187-88, 544 N.E.2d at 384, 385-86.

(5) *Ms. Douyon.* Citing *McDonald*, defendant contends that by excluding Ms. Douyon because she resides near the scene of the crime, the State impermissibly engaged in "a group-based exclusion" which would effectively eliminate blacks from the jury simply because they live on the South Side of Chicago, a predominantly black neighborhood. We recognize the State's concern that a juror who lives in close proximity to the area where the offense took place may overhear certain information about the offense during the pendency of the trial and thereby lose his or her objectivity. (See *United States v. Andrade* (8th Cir. 1985), 788 F.2d 521 (potential juror's residence in area of defendant's alleged criminal operation a proper basis for exclusion), *cert. denied* (1986), 479 U.S. 963, 93 L. Ed. 2d 408, 107 S. Ct. 462; see also *Hooper*, 133 Ill. 2d at 509-10, 552 N.E.2d at 701.) Although the fact that Ms. Douyon lives approximately five miles from 103rd and LaSalle Streets makes the State's position more tenuous, we cannot say that the trial court's finding that the prosecutors' exclusion of Ms. Douyon was not racially motivated is contrary to the evidence. Nor may we consider the State's contention that it struck Ms. Douyon from the jury because she is a nurse's aide in a hospital in the immediate vicinity of the hospital where the victim was taken after being shot, since this explanation came to light for the first time only on appeal.

Defendant does not complain about the removal of a sixth black venireman, Jerry Brown, who, as noted earlier, failed to indicate on his jury summons card that he had been arrested twice before. The trial court refused to excuse him for cause, but found that the State's use of a peremptory strike against him on account of his criminal record was racially neutral and legitimate.

In sum, we find that the evidence supports the trial court's final determination that there was no systematic exclusion of members of the black race from the jury. In the absence of other complaints regarding the procedural fairness of defendant's conviction, we find that defendant received a fair and impartial trial.

## REVIEW OF THE SUFFICIENCY OF THE EVIDENCE

Defendant challenges the sufficiency of the evidence used to

convict him, contending that the State failed to prove him guilty of murder beyond a reasonable doubt. Our supreme court offers us decisive guidance in resolving defendant's challenge in *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89, wherein it held that the relevant question a reviewing court must ask is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " This standard demands that we resolve all issues of weight and credibility and conflicts in the evidence in favor of the State. (128 Ill. 2d at 51, 538 N.E.2d at 473-74.) We may reverse a conviction only if "the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." 128 Ill. 2d at 51, 538 N.E.2d at 474.

Defendant argues that various inconsistencies in the testimony of witnesses raise a reasonable doubt. For example, he notes that Anderson saw him holding a black gun against his right thigh but did not see a hat, whereas at about the same time Cunningham saw him holding a black hat over his right hand but did not see a gun. Also, Cunningham testified at trial that a man walked up to defendant and said "give me the gun, give me the gun" shortly after the shooting; but Cunningham did not mention a gun to the police, relating that the man said merely "give it to me, give it to me."

Furthermore, defendant contends that certain evidence used to convict him was too weak to support a finding of guilt beyond a reasonable doubt. For instance, he maintains that the artificial lighting conditions and general confusion at the scene of the crime raised a doubt about the witnesses' ability to clearly observe what was happening. Also, he contends that the results of the gunshot residue test were fatally inconclusive because (1) defendant could have tested positive for antimony, barium and lead if he worked in a foundry or had handled gasoline; and (2) the police officer who administered the test could not determine positively whether defendant had fired a weapon or merely handled one after it discharged.

Defendant further argues that the evidence was insufficient because it was purely circumstantial: no one saw him fire the shots. And finally, Iva Brown's alibi testimony and the fact that defendant remained on the scene of the crime and cooperated with the police raise additional questions of identity.

■■ Although proper in closing argument, defendant's contentions invite us to displace the trier of fact and to weigh the evidence

and credibility of the witnesses, which is exactly what the *Young* standard admonishes the reviewing court not to do. When we interpret all of the evidence in a light most favorable to the prosecution, it becomes clear that a jury could have reasonably found defendant guilty beyond a reasonable doubt. The evidence at trial revealed that both Anderson and Cunningham saw defendant standing against a pole several feet from the victim only seconds before the shooting. Anderson saw him holding a gun, and Cunningham saw him hiding something under a hat that he believed was a gun. Cunningham also heard a man walk up to defendant and say "give me the gun, give me the gun." The gunshot residue test, administered only three hours after the shooting to defendant who had been taken into custody only 10 minutes after the shooting, indicated with high probability that defendant had recently fired a weapon. Furthermore, during cross-examination, Officer Salabura testified that O'Neal identified defendant as the shooter to the police. Coupled with the inference of a motive arising from the fight over the victim's treatment of O'Neal, this evidence points unmistakably to defendant's guilt. Accordingly, we affirm.

Affirmed.

DiVITO, P.J., and HARTMAN, J., concur.