SECOND DIVISION 

                                March 11, 1997 

 

 

 

 

 

 

 

No. 1-94-1948 

 

THE PEOPLE OF THE STATE OF ILLINOIS, )    Appeal from the 

                                     )    Circuit Court of 

            Plaintiff-Appellee,      )    Cook County. 

                                     ) 

  v.                                 ) 

                                     ) 

GEORGE DAVIS,                             )    Honorable 

                                     )    Daniel Kelley, 

            Defendant-Appellant.     )    Judge Presiding. 

 

  PRESIDING JUSTICE McNULTY delivered the opinion of the court: 

 

  After a jury trial, defendant George Davis was found guilty of 

first degree murder and sentenced to 50 years' imprisonment.   

Defendant contends on appeal that:  (1) the State committed a  Batson 

violation;  (2)  the trial court erred in granting the State s motion 

in limine preventing the defense from eliciting evidence of 

occurrence witnesses' gang affiliation; (3) he was provided 

ineffective assistance of counsel when his counsel failed to properly 

investigate defendant s prior conviction, informed the jury that 

defendant would testify, and then later attempted to explain to the 

jury why defendant did not testify;  (4) the prosecutor made improper 

remarks in closing argument; and (5) the trial court erred in relying 

on defendant s causing or threatening serious harm as an aggravating 

factor in sentencing.  We reverse and remand. 

  Anthony Fisher, whose nickname was "Buck," testified that on May 

29, 1991, at 1:30 a.m., he was outside of his home at 6829 S. Perry, 

talking to his friend, Lethon Rogers. Fisher and Rogers talked for 

about 10 or 15 minutes, and then started walking across the street.  

Fisher then saw a man whom he recognized as George Harrison slowly 

driving a black and gold Trans Am down the street.  Fisher also saw 

defendant, whom he knew from the neighborhood, seated on the front 

passenger side of the vehicle.  Fisher testified that he had also 

seen Harrison earlier that day in the Trans Am. Fisher and Rogers 

thought that it was suspicious that the Trans Am was moving at a pace 

of about five miles per hour and that the occupants seemed to be 

looking for someone.  Fisher and Rogers therefore shouted a warning 

to friends Shawn, "Kango," Emma and Sheila.   

     At around 2 a.m., Fisher and Rogers met up with a friend Leonard 

Smith, and as the three stood near the front of Fisher's and Rogers' 

homes, Fisher heard Kango say "Heads up," telling them to watch out.  

Rogers did not hear the warning, but Fisher looked around frantically 

before he heard a shot and then saw defendant firing a gun.  The 

shooting occurred about five minutes after defendant and Harrison had 

slowly passed down the street.  Defendant was in a standing position 

in the Trans Am, which had its t-tops open.  The first shots Fisher 

saw defendant shoot were aimed at Shawn, Emma and Sheila, who were 

standing about 15 to 20 feet away from Fisher.  Fisher, Rogers and 

Smith hit the ground. Defendant began shooting at them.  Rogers and 

Smith began running.  Two more shots were fired.  Defendant shot 

towards Rogers and Smith, and defendant and Harrison sped off.  

Rogers them came running toward Fisher saying that he had been hit. 

Rogers died as a result of his injuries.   

     The following day, after hearing that Fisher had witnessed the 

shooting, Fisher s mother sent him to Washington, D.C.  Fisher 

testified that he feared for his safety because defendant was a known 

drug dealer.  Fisher lived in Washington, D.C., for six weeks prior 

to beginning college in Mississippi.  Fisher returned to Chicago in 

May 1992 and learned that defendant and Harrison were to be tried for 

Rogers  murder.  Fisher then spoke with prosecutors and subsequently 

testified at Harrison s trial.  Fisher had been arrested on an 

unrelated charge following Harrison s trial.  Although a person named 

Tim Hampton signed the bail bond receipt to release Fisher from jail 

on that charge, Fisher testified that he did not know anyone by that 

name at the address listed on the receipt.   

  Leonard Smith testified consistently with Fisher s testimony, 

although Smith testified that he did not see the persons inside the 

car.  Smith admitted that he had a previous conviction for possession 

of a controlled substance with intent to deliver for which he 

received probation in 1992. 

  Detective John Halloran testified that defendant was arrested 

and the Trans Am was impounded.  The fingerprints in the car were 

smudged and not suitable for comparison.  Palmprints on the car s 

exterior did not belong to either defendant or Harrison.  The owner 

of the car did not know defendant or Harrison and reported the car 

stolen three days before the shooting.   

  Donald Jenkins testified following his arrest for failure to 

respond to a subpoena.  He testified that on April 19, 1993, two 

years after the shooting, defendant confronted him and told him in 

a threatening tone that neither he nor his daughter or grandson was 

to attend the trial.  Jenkins refused to comply with this request, 

and defendant reached into his back pocket, pulled out a piece of 

paper and hit it against his hand.  As defendant was walking away, 

he said that he should have "got" Buck (Fisher) first. 

   Jenkins admitted that he had pled guilty in 1988 to burglary, 

received probation, and was arrested in 1978 for the filing of a 

false police report, which he explained as a misunderstanding 

regarding his car and a friend who took the car without permission.  

  James Hollins testified on defendant s behalf that he was the 

owner of Good Rockin  Lounge at 6950 S. Wentworth in Chicago, which 

was located 2 blocks from the crime scene.   Defendant entered the 

lounge at 1 a.m. on May 29, 1991.   Hollins  routine is to empty the 

bar at 1:45 a.m. so that he can close at 2 a.m.  He did not know 

defendant s whereabouts between 1 a.m. and when he saw him outside 

the bar at about 2:15 a.m.            

  Steven Harris testified that he saw defendant at the lounge on 

the night of the shooting.  Frank Holmes testified that he drank and 

shot pool with defendant at the lounge on the night in question, but 

they were not together the entire time.  Holmes had pled guilty in 

1991 to delivery of cocaine and in 1993 to possession of a controlled 

substance and unlawful use of a weapon by a felon.  Phillip Mitchell 

testified that at around 2 a.m. he was in front of his mother s house 

at 6943 S. Wentworth, with defendant, who had been there since the 

lounge closed.  A lady came by and said someone had been shot.  

Mitchell did not recall telling an investigator that he did not know 

defendant or anyone by that name, or saying that he was not a witness 

to the shooting.     

  Cook County State s Attorney Investigator Thomas Shine testified 

in rebuttal that he had called Phillip Mitchell and Mitchell informed 

him that he did not know defendant and that he had not witnessed any 

shooting. 

  At the conclusion of this evidence, defendant was found guilty 

of first degree murder and sentenced to 50 years  imprisonment.   

  Defendant's first claim on appeal is that a Batson violation 

occurred when the State exercised peremptory challenges to dismiss 

four African-American veniremembers in a racially motivated manner.  

Defendant claims that the trial court hastily ruled that the defense 

had not established a prima case of discrimination, ordered the State 

to provide race-neutral reasons for its challenges, and then 

erroneously held that the proposed race-neural reasons were proper.  

When the defense raised its Batson claim, it stated that "[t]his is 

a pretty congenial group out there as far as their background, except 

for the people who lied to us."  After naming the four African- 

American and one white venirepersons excused by the State, the trial 

court stated that "I am not going to find that a prima facie case has 

been made but I am going to ask the State to put their reasons on the 

record."  After the State stated its reasons for exercising its 

challenges, the trial court stated that these were legitimate race- 

neutral reasons.   

  In Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 

1712 (1986), the United States Supreme Court outlined the procedure 

for determining whether the State used its peremptory challenges in 

a racially discriminatory manner.  First, the trial court is to 

determine whether the defendant has made out a prima facie case of 

discrimination.  If the trial court determines that the defendant has 

made a prima facie showing, the burden shifts to the State to provide 

legitimate race-neutral reasons for its use of peremptory challenges 

on African-American venirepersons.  Lastly, the trial court must 

determine, in view of all of the relevant circumstances, whether the 

defendant has demonstrated the existence of intentional racial 

discrimination.  

     Defendant claims that the trial court did not follow the 

procedure set forth in Batson.  Defendant claims that because the 

trial court hastily determined that he had not established a prima 

facie case of discrimination, asked the State to provided its 

explanations for its peremptory challenges, and then ruled on the 

validity of these explanations, the issue of whether a prima facie 

case had been established became moot and the only issue in this 

appeal is whether the court made a proper ultimate determination on 

the issue of racial discrimination.   

  In Hernandez v. New York, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 

 405, 111 S. Ct. 1859, 1866 (1991), the Supreme Court held that 

 "[o]nce a prosecutor has offered a race-neutral explanation for the 

 peremptory challenges and the trial court has ruled on the ultimate 

 question of intentional discrimination, the preliminary issue of 

 whether the defendant had made a prima facie showing becomes moot."  

  The Illinois Supreme Court has applied Hernandez and found that 

the prima facie issue is moot regardless of whether the trial judge 

prompts the State to present neutral reasons for exercising 

challenges or the State defends its use of peremptory challenges 

without any prompting by the court. People v. Hudson, 157 Ill. 2d 

401, 626 N.E.2d 161 (1993).  People v. Mitchell, 152 Ill. 2d 274, 

604 N.E.2d 877 (1992).  

  Our case is similar to People v. Thomas, 266 Ill. App. 3d 914, 

641 N.E.2d 867 (1994).  In that case, the trial court stated that, 

although it did not believe that a prima facie case had been made, 

it believed that some panels of the appellate court might disagree 

and therefore asked the State to give its reasons for exercising its 

challenges.  After the State gave its reasons, the trial court again 

stated that no prima facie case had been made and then discussed why 

it believed the State presented race-neutral reasons for striking 

the venirepersons.  The appellate court determined that when the 

trial court ruled on the ultimate issue of purposeful 

discrimination, the issue of whether defendant established a prima 

facie case became moot.  We reach the same conclusion here and, 

thus, need only address the ultimate issue of whether there was 

intentional discrimination. 

  The State claimed that it excused venireperson Ruth Ewing 

because defendants frequently turn themselves in to her husband, 

investigative reporter Russ Ewing.  Sean McGee was excused because 

he spent two years of college as a criminal justice major and the 

State felt that he would be too sympathetic toward the defendant and 

possibly lead the jury down the wrong path.  Willie Saffold was 

removed because the State was concerned he could not pay attention 

to detail since he could not remember his children's ages, he did 

not work and he answered questions incorrectly on his juror 

questionnaire.  We agree with the trial that these were valid 

reasons for exercising peremptory challenges.   

  However, we reach a different conclusion from the trial court 

on the State's excusal of Bertha White.  The prosecutor claimed that 

he excused White because she "has a son approximately the 

defendant's age; we felt that she would be very sympathetic towards 

[defendant]."  In order to satisfy the second prong of the Batson 

analysis, the prosecutor's explanation for excusing the venire- 

person need not be persuasive or even plausible.  Purkett v. Elem, 

514 U.S. 102, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995).  However, 

the persuasiveness of the justification becomes relevant at the 

third stage of the Batson proceeding when implausible or fantastic 

justifications are likely to be found pretexts for discrimination.  

Purkett, 514 U.S. at _, 131 L. Ed. 2d at 839, 115 S. Ct. at 1771.   

  The record here reveals that the prosecutor's explanation for 

excusing White because her son was "approximately" defendant's age 

was clearly pretextual.  White's son was only 21 years old at the 

time of trial, while defendant was 36 years old.  Furthermore, the 

prosecutor accepted other venirepersons with children closer in age 

to defendant.  The prosecutor  accepted a white juror whose son was 

in his late 20s.  See People v. Harris, 129 Ill. 2d 123, 544 N.E.2d 

357 (1989)(if a prosecutor strikes a minority venireperson for 

possessing certain characteristics but does not reject a nonminority 

juror who shares the same characteristics, there is a presumption 

that the prosecutor's explanations were pretextual).  If the 

prosecutor truly did not want jurors with sons close to defendant's 

age, the white juror would have been the more logical venireperson 

to excuse.  The State also accepted two African-American jurors 

whose sons were in their middle thirties.  The fact that the sons of 

these two African-American jurors matched defendant s age more 

closely than White s son further underscores the fact that the 

State s reason for excusing White was pretextual.   

  The State claims that the prosecutor asserted two distinct 

reasons for excusing White, one, that her son was approximately 

defendant's age, and two, that the prosecutor believed that she 

would be very sympathetic to defendant.  Our review of the 

prosecutor's explanation, quoted above, for excusing White reveals 

a link between her son's age and the prosecutor's belief that she 

would be sympathetic to defendant.  The prosecutor was essentially 

stating that he believed White would be very sympathetic to 

defendant because she had a son close to defendant s age.  The 

prosecutor offered no other reason for believing White would be too 

sympathetic toward defendant.  However, White certainly would be no 

more sympathetic toward defendant than those chosen jurors with sons  

even closer to defendant's age.  We therefore conclude that the 

State's explanation for dismissing juror White was pretextual, and 

for this reason we reverse defendant's conviction and remand for a 

new trial. 

      We address the following issues that may arise on remand, as 

well as the ineffective assistance of counsel claim, which would 

have been a basis for reversal even if there had been no Batson 

violation.  We first turn to the issue of whether defendant should 

have been allowed to introduce testimony that the State s witnesses  

belonged to the same gang as the deceased.  Although defendant was 

not a gang member, defendant claims that the State's witnesses  gang 

membership was relevant to show their bias in the form of sticking 

together and testifying consistently with each other, and to rebut 

the impression cultivated by the State that its chief witness 

Anthony Fisher, was a well-behaved college student.  

  Defendants have a constitutional right to cross-examine 

witnesses for the purpose of showing bias, prejudice, or a motive to 

testify falsely.  Ill. Const. 1970, art. I, 8.  While defendants 

are granted wide latitude in conducting cross-examination to show 

bias, a trial court may limit such an inquiry in order to avoid 

harassment, prejudice, confusion of the issues, repetitive or 

irrelevant testimony, or the introduction of remote or uncertain 

evidence.  People v. Jefferson, 260 Ill. App. 3d 895, 631 N.E.2d 

1374 (1994).  A trial court's limitation of the defendant's attempt 

to show bias will be reversed only if the court abused its 

discretion, resulting in manifest prejudice to defendant.  

Jefferson, 260 Ill. App. 3d at 904.             

     In support of the admission of this gang evidence, defendant 

relies on People v. Gonzalez, 104 Ill. 2d 332, 472 N.E.2d 417 

(1984), wherein the Illinois Supreme Court found that the trial 

court erred in preventing defendant from cross-examining a key State 

witness on his gang affiliation. In Gonzalez, the defendant had 

recently withdrawn from gang membership.  The gang, and particularly 

the key witness testifying against defendant, had threatened to 

"get" defendant and his family if defendant did not renew his gang 

membership.  The court found that evidence of the witness' gang 

membership should have been admitted at trial since the defense 

theory was that defendant was being framed and the witness had a 

motive to testify falsely either to "get" defendant or to avoid 

being implicated in the crime.  Therefore, evidence of the witness' 

gang affiliation was relevant to the trial. 

     The instant case, however, bears more similarity to People v. 

Jefferson, 260 Ill. App. 3d 895, 631 N.E.2d 1374 (1994), where the 

witness' gang membership was excluded since it was completely 

unrelated to the crime and in no way relevant to the defense theory.  

In our case, defendant has not alleged that State witnesses had a 

motive to falsely accuse him.  There was no evidence of any gang 

retaliation or gang rivalry.  The issue of gangs is completely 

immaterial to the case and therefore properly excluded from trial.  

Furthermore, while defendant claims that the prejudicial impact of 

excluding Anthony Fisher's gang affiliation was heightened by the 

fact that the prosecution portrayed Fisher as a college student, the 

defendant brought into question Fisher's credibility by informing 

that jury that Fisher had been charged with a crime and was out on 

bail.   

  We next address whether defendant was denied effective 

assistance when his counsel: (1)  informed the jury that defendant 

would testify, failed to investigate whether defendant had a prior 

conviction and attempted to explain to the jury why defendant did 

not testify; (2) failed to elicit the fact that the State s main 

witness, Anthony Fisher, had  attempted murder charges pending 

against him; and (3) failed to take the steps necessary to prove up 

a statement by Fisher to defense counsel that he wanted help from 

the prosecutor.  A defendant receives ineffective assistance of 

counsel if his counsel s performance was so deficient that his error 

deprived defendant of a fair trial.  Strickland v. Washington, 466 

U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).   

     In opening statement, the defense attorney informed the jury 

that they would hear from defense witnesses and defendant and that 

those people would testify that, at the time of the shooting, the 

defendant was at the Good Rockin' Lounge and was nowhere near the 

scene of the shooting.  During the defense case, four witnesses 

testified as to defendant s whereabouts on the night of the 

shooting.  Defense counsel intended to have defendant testify next 

but claimed that the State had surprised him by seeking to introduce 

a prior conviction of the defendant of which defense counsel was 

unaware.  This prior conviction was a 1986 Montana guilty plea to 

two counts of criminal possession of a dangerous drug with intent to 

sell.  The prosecutor informed the court that he had supplied 

defense counsel with certified copies of defendant s city, state, 

and federal "rapsheets," which mentioned the Montana guilty plea.   

Defense counsel did not deny receiving these sheets, but argued 

instead that defendant s guilty plea was not a conviction because 

the plea could have been withdrawn by defendant under certain 

circumstances for a period of three years.  The three-year period, 

however, had expired and the guilty plea was never withdrawn.  After 

the trial court ruled that these were convictions, and that the 

prosecutor could introduce them if defendant testified, defense 

counsel decided to recommend to defendant that he not testify at 

trial.  During closing argument, defense counsel attempted to 

explain to the jury why defendant did not testify by stating that, 

although they did not hear from defendant, they heard from defendant 

through the four witnesses who testified.  

     We find that defendant received ineffective assistance of 

counsel when his counsel informed the jury that defendant would take 

the stand, although he had not investigated or obtained a ruling on 

the admissibility of defendant's prior conviction, and then drew 

attention to the defendant's failure to testify, when he commented 

on such in closing argument.  The instant case is distinguishable 

from People v. Schlager, 247 Ill. App. 3d 921, 617 N.E.2d 1275 

(1993), wherein defense counsel promised the jury that defendant 

would testify, but after becoming aware of defendant's credibility 

problem, decided not to put on a defense, but instead argue that the 

State had not proved its case beyond a reasonable doubt.  The court 

in Schlager found this to be trial strategy, noting that counsel 

"did not exhibit a misunderstanding of the fundamental rules of 

civil procedure, nor did defense counsel fail to subject the State's 

witnesses to meaningful adversarial testing, nor did defense 

counsel's trial strategy contain flawed legal arguments."  Schlager, 

247 Ill. App. 3d at 932.   

     Our case bears more similarity to People v. Lewis, 240 Ill. 

App. 3d 463, 609 N.E.2d 673 (1992), wherein defense counsel told the 

jury in opening statement that defendant gave a pretrial statement 

that was exonerating.  The court determined that counsel was 

ineffective in promising to produce such significant exonerating 

evidence, when such evidence was clearly inadmissible, and that the 

failure to fulfill such promise was highly prejudicial.        

     In the instant case, while counsel did present some exonerating 

evidence as to defendant's whereabouts at the time of the shooting, 

he did not present the most important piece of evidence he had 

promised to produce, defendant's testimony.  The impact of a 

defendant's testimony and the weight given to such testimony by a 

jury is certainly greater than that of an ordinary witness.  

Furthermore, it was defense counsel's own failure to investigate 

defendant's plea or obtain a ruling from the court on whether the 

plea was a conviction, prior to opening statement, that caused his 

promise to the jury to be unfilled.  This cannot be deemed trial 

strategy.  Had the prosecutor been the one to comment on defendant's 

failure to testify, this would clearly have been prejudicial error.  

Griffin v. California, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 

1229 (1965).  Here, defendant was prejudiced by his own counsel's 

emphasis on defendant's failure to testify.  This error alone would 

have given us sufficient basis to reverse defendant's conviction.   

  Turning to defendant's next claim of ineffective assistance of 

counsel, we do not find that counsel was ineffective in failing to 

elicit the fact that the State's chief witness, Anthony Fisher, had 

attempted murder charges pending against him.  Rather, we find this 

to be trial strategy.  Had counsel introduced evidence of Fisher s 

pending attempted murder charges in order to show that Fisher s 

testimony was motivated by a desire to obtain favorable treatment 

from the State, the State would have elicited evidence from Fisher 

that, prior to being charged, he had testified at codefendant 

Harrison s trial consistently with how he had testified at 

defendant s trial.  Thus, defendant would have derived no benefit 

from defense counsel eliciting evidence of Fisher s charge.   

     Defendant also claims that his counsel was ineffective in 

failing to take the steps necessary to prove up a statement by 

Fisher to defense counsel during a pretrial interview that Fisher 

wanted help from the prosecutor on his pending charge for attempted 

murder.  Fisher denied making this statement, and the trial court 

determined that defendant could only prove up this conversation if 

defense counsel disqualified himself and then became a witness at 

trial.  Defense counsel instead chose not to prove up the 

conversation.  The trial court then struck the question and answer 

regarding the conversation.  It is our opinion that counsel's 

decision to remain in the case rather than withdraw can indeed be 

considered trial strategy.   

  Defendant also claims find that the prosecutor made several 

improper comments in closing arguments.  We agree and find that the 

following comments must not be repeated on retrial.  The prosecutor 

improperly voiced his personal opinion and used the integrity of the 

State's Attorney's office when he commented that defense witnesses 

were the worst liars he had ever seen testify for a defendant.   See 

People v. Valdery, 65 Ill. App. 3d 375, 381 N.E.2d 1217 (1978) (the 

prosecutor's repeated comments that the State's witnesses had the 

highest integrity and character he had ever seen were held to be 

highly prejudicial because they placed the integrity of the State's 

Attorney behind the witnesses).          

  The prosecutor also improperly implied that an expert cannot be 

cross-examined with another expert's prior diagnosis and shifted the 

burden of proof when he commented that the defense attacked the 

State's expert pathologist through cross-examination rather than by 

the defense presenting its own expert.  An expert may be impeached 

with another expert's report (People v. Silagy, 101 Ill. 2d 147, 461 

N.E.2d 415 (1984), and the defense had no obligation to call any 

witnesses.   

  The prosecutor also improperly argued facts not in evidence when 

he stated that the Trans Am owner's fingerprints were not found in 

the car and that Fisher had stated at a previous trial that 

defendant was the shooter.  We also note that the prosecutor 

improperly showed extreme disdain for the defense by stating in 

closing argument, "[t]his is how worthless this piece of paper is,"  

and crumpling up a defense exhibit which the court had admitted into 

evidence.     

    Finally, we note that if defendant is again found guilty, the 

trial court can consider as an aggravating factor the force employed 

and the manner in which the crime was committed, but it must not 

consider that defendant's conduct caused serious harm, since this is 

inherent in the offense of murder.  People v. Saldivar, 113 Ill. 2d 

256, 497 N.E.2d 1138 (1986). 

  Accordingly, for the reasons set forth above, defendant s 

conviction is reversed and this cause is remanded for a new trial. 

  Reversed and remanded. 

  Gordon, J., concurs. 

  Hourihane, J., dissents. 

 

 

  Justice Hourihane, dissenting: 

  The majority concludes that the State's explanation for excusing 

veniremember Bertha White was "clearly pretextual" and thus 

necessitated the reversal of the defendant's conviction and 

sentence.  In reaching this conclusion, the majority notes that when 

asked to proffer a basis for his challenge of Ms. White, the 

prosecutor indicated that he was challenging her because she had a 

son approximately the defendant's age and he felt that she would be 

sympathetic toward the defendant.  The majority then concludes that 

this reason was "clearly pretextual" because a white member of the 

jury who also had a son approximately the defendant's age was not 

challenged by the State.   

  I respectfully disagree for the reasons which follow.  First, the 

courts of this state have repeatedly recognized that the State may 

legitimately exercise a peremptory challenge to exclude a 

prospective juror because he or she has children of an age close to 

the defendant's. See People v. Andrews, 155 Ill. 2d 286 (1993); 

People v. Lovelady, 221 Ill. App. 3d 829 (1991); People v. Baisten, 

203 Ill. App. 3d 64 (1990); People v. Batchelor, 202 Ill. App. 3d 

316 (1990).  Accordingly, there is nothing inherently suspicious or 

pretextual about the State offering such a reason for excluding a 

potential juror. 

  Second, it would be improper for us to assume, as the majority 

does, that the trial court erred in finding an absence of 

discriminatory intent merely because the State accepted a white 

juror who possessed a similar characteristic.  As our supreme court 

stated in People v. Wiley, 165 Ill. 2d 259 (1995): 

       "In reviewing the reasons given by the State, it is 

     necessary to bear in mind that '"in many instances there 

     will be no single criterion that serves as the basis for 

     the decision whether to excuse a particular venireman."' 

     (People v. Mitchell (1992), 152 Ill. 2d 274, 295, quoting 

     People v. Mack (1989), 128 Ill. 2d 231, 239.)  The 

     State's purposeful discrimination is not automatically  

     established by the mere coincidence that an excluded 

     juror shared a characteristic with a juror who was not 

     challenged.  The excluded juror may possess an additional 

     trait that caused the State to find him unacceptable, 

     while the juror who was not challenged may possess an 

     additional characteristic that prompted the State to find 

     him acceptable to serve as a juror. [Citation]  '[A] 

     peremptory challenge is based on a combination of traits, 

     and a juror possessing an unfavorable trait may be 

     accepted while another juror possessing that same 

     negative trait, but also possessing other negative 

     traits, may be challenged.' Mitchell, 152 Ill. 2d at 

     295." People v. Wiley, 165 Ill. 2d at 282-83.  

       In this case, the State did not challenge white veniremember 

Angelo Baez though he also had a son close to the age of the 

defendant.  While this fact may raise an inference of purposeful 

racial discrimination, such is not dispositive. People v. Mack, 128 

Ill. 2d 231.  The record reveals that at least three members of the 

actual jury had children close to the defendant's age.  Mr. Baez, 

a white resident of the north side of Chicago was married and had 

a 28-year-old son who was ser