GARY LIVELY, Plaintiff-Appellee, v. NICK KOSTOFF, Defendant-Appellant.

Fifth District   No. 5—86—0723

Opinion filed March 18, 1988.

David A. Bloch and Burton C. Bernard, both of Bernard & Davidson, of Granite City, for appellant.

Robert W. Bosslet and David J. Mullett, both of Morris B. Chapman & Associates, Ltd., of Granite City, for appellee.

PRESIDING JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Gary Lively, brought an action in the circuit court of Madison County to recover damages for personal injuries he sustained when his motorcycle was struck by an automobile driven by defendant, Nick Kostoff. Following a lengthy trial, the jury found in favor of plaintiff and determined that the total amount of damages he had sustained as a proximate result of the collision was $225,000. At the same time, the jury concluded that plaintiff had been 40% contributorily negligent. It therefore reduced his recoverable damages to $135,000. The circuit court entered judgment for plaintiff on this verdict. Defendant's post-trial motion was denied, and this appeal followed.

Four basic issues are presented for our review: (1) whether the circuit court erred in allowing the admission of evidence which showed that defendant had been drinking, (2) whether impeachment by plaintiff's counsel of the sole nonparty eyewitness was proper, (3) whether the police officer who investigated the accident should have been permitted to express his opinion as to the speed of plaintiff's motorcycle at the time of the collision, and (4) whether the circuit court erred when it instructed the jury as to the applicable law. Based upon his analysis of these issues, defendant asserts that he is entitled

to a new trial. For the reasons which follow, we agree that the proceedings in this case were not error free. Nevertheless, we have concluded that none of the errors were sufficient to warrant setting aside the circuit court's judgment. We therefore affirm.

The collision which gave rise to this litigation took place on May 19, 1981, at the intersection of Pontoon Road and Stearns Avenue in Granite City, Illinois. It was early evening, between 5:30 and 6 p.m., on what had been a sunny day. At the time of the accident, the sun was approaching the western horizon.

Pontoon Road is a two-lane thoroughfare which runs east to west. It is intersected by Stearns Avenue at a 90-degree angle. Stearns is the point of entry from Pontoon Road into a residential area. There are no traffic controls or signs at the intersection for traffic on Pontoon Road, but the area is straight, level, and free of visual obstructions. The posted speed limit on Pontoon Road at this point is 35 miles per hour.

The evidence showed that on the day in question, defendant stopped at Charlie's Restaurant for "happy hour" on his way home from work. He was there for 20 to 25 minutes and drank two bourbon highballs. Defendant testified that he is 5 feet, 9 inches tall, weighs about 181 or 182 lbs., and is 58 years old. He does not consume moderate to large amounts of alcohol on a daily basis. Defendant had apparently eaten nothing all day, although he thought that he may have snacked on hors d'oeuvres at Charlie's. At the time, defendant was taking "a combination drug, esidrix/serpasil" by prescription for high blood pressure. Medical testimony adduced by plaintiff indicated that esidrix is simply a "water pill," but that serpasil is a blood pressure medication

> "which is not used much today in terms of being prescribed for new patients who have blood pressure problems because it has some serious, potentially serious side effect[s] including some sedation, which we call central nervous system depression, which is a term that kinda' slows reactions to some extent. And some people who are on it become profoundly depressed because it depletes certain chemicals in the brain which are related to regulation of emotion."

After leaving Charlie's, defendant proceeded home. He had been driving eight or nine minutes and was headed east down Pontoon Road at about 30 miles per hour when he approached Stearns Avenue. He slowed down, activated his left turn signal, and surveyed the area for other traffic. All he observed was an automobile coming the opposite direction down Pontoon Road about 600 feet from the intersec-

tion. Believing it was safe to execute the turn, defendant proceeded through the intersection into Stearns Avenue, a maneuver which took about five or six seconds. In the process of making the turn, however, defendant suddenly glimpsed a light out of the corner of his right eye and then felt a flick on his right rear bumper. The light turned out to be the headlight of plaintiff's motorcycle, and the "flick" was caused by defendant's bumper striking plaintiff, who had been heading west on Pontoon Road.

As defendant was completing his turn, he looked over his left shoulder and saw plaintiff sliding along the pavement on the motorcycle. He pulled over along Stearns Avenue, got out of his car, and walked over to the area where he had seen plaintiff sliding. Approximately 140 feet from the intersection, he found plaintiff lying in a ditch with his leg pinned beneath the motorcycle. According to defendant, he spoke with plaintiff at the hospital a day or two after the accident, and plaintiff admitted that he had been going too fast.

Plaintiff testified that just before the collision, he had turned onto Pontoon Road from Village Lane, which is east of Stearns Avenue. Once on Pontoon Road, he headed west towards Stearns at speeds which did not exceed 35 miles per hour. There was no traffic ahead of him, and he saw defendant's car signaling to make a left turn. When he first saw the car, he was not sure whether it was already at the intersection or was still creeping up to it, but in any case, he thought that the car was stopped by the time he was about to reach it. Plaintiff continued along at 30 or 35 miles per hour, but when he was 10 or 15 feet from defendant's car,

> "[defendant] just pulled right in front of me. And I, you know, I didn't know for sure what he was gonna' do, whether he was gonna' turn or not. And then all of a sudden, you know, he turned."

According to plaintiff, he applied his brakes, but was unable to stop in time. The right rear bumper of defendant's car was already into plaintiff's lane, and the bumper struck plaintiff's right leg. Plaintiff then lost control of the motorcycle, which rolled over while he was still on it. Plaintiff was apparently hurled along the pavement until both he and the motorcycle came to rest in a water-filled ditch alongside the roadway.

Plaintiff was eventually able to pull himself out of the ditch. He recalled that he then "looked down at my leg, and my foot was just kinda' like layin' off to the side. And the bones were stickin' out through the sock that I had on. And I could see my blood coming through my Levis." At this point, plaintiff went into shock, and he

was transported by ambulance to the hospital.

The emergency room physician who treated plaintiff testified that plaintiff had sustained a "compound, comminuted [multiple] fracture of the right tibia and fibula, with multiple laceration and macerated muscle at the laceration area of the leg." Plaintiff was placed under general anesthesia while the lacerations were cleaned and the bone fractures repaired. Two days later he was placed under general anesthesia again so that his dressings could be changed, and over the next two years he underwent a number of additional operations, including bone and skin grafts.

As a result of his injuries, plaintiff was unable to return to his job at Granite City Steel until October of 1983. He suffered lower leg scarring and some limitation of ankle movement. In addition, he claimed that his leg was shortened by 3/4 to 1 inch and that he had developed a limp, although the leg shortening and limp were not reported by his doctor.

The only nonparty eyewitness to testify was John Ballentine, who was called on behalf of the defendant. The purpose of Ballentine's testimony was to refute plaintiff's claim that he was not speeding at the time of the collision. According to Ballentine, who was driving west along Pontoon Road behind plaintiff when the accident took place, plaintiff's motorcycle reached speeds of between 60 and 70 miles per hour and was traveling at "about 60" at impact.

During cross-examination, plaintiff's attorney elicited from Ballentine that he had previously testified at his deposition that plaintiff's motorcycle had reached speeds of up to 80 miles per hour. Ballentine also admitted over objection that he had once been convicted of disorderly conduct "for knowingly transmitting to a Police Report, a report that the offense of aggravated battery had been committed, knowing at the time of such transmission that there was no reasonable ground for believing that such offense had been committed."

The police officer who investigated the collision was Kenneth Lee Crawford, a nine-year veteran of the Granite City police force. According to Crawford, Ballentine had not reported to him that plaintiff had been traveling at an excessive rate of speed. Crawford stated that he had inspected the roadway for evidence of skid marks, but had found none. In Crawford's opinion, this was significant because if plaintiff had in fact been traveling at a high rate of speed and then applied his brakes, skid marks would have been made. Crawford also related the details of another accident he had previously investigated. In that case, a truck had pulled out in front of a motorcycle, and the vehicles collided at "highway speed, 55." The collision had split the

motorcyclist's leg open, "like a wishbone," and he was dead on the scene. The apparent reason for eliciting this opinion was to suggest to the jury that if plaintiff had been going as fast as Ballentine claimed, he would have met a similar fate.

On cross-examination, Crawford clarified that he had not meant to give an opinion as to plaintiff's speed at the time of impact and did not, in fact, know how fast plaintiff had been traveling. He also stated that there was no evidence of drinking by either plaintiff or defendant and that he had not administered tests to either one for alcohol consumption.

The other witness whose testimony figures prominently in this appeal was Dr. David Paul. Dr. Paul graduated from Jefferson Medical College in Philadelphia in 1973 and received post-graduate education in general surgery at Barnes Hospital in St. Louis, Missouri. He studied pharmacology as part of his medical training and has undertaken post-graduate education in toxicology. He is licensed to practice medicine in Illinois, Missouri, and Colorado, and is board certified in emergency medicine. Currently he serves as clinical associate professor at the Southern Illinois University School of Medicine and holds the position of director of the emergency department at Memorial Hospital in Belleville, Illinois. He was also director of the poison treatment center at Memorial Hospital for 10 years.

Dr. Paul told the jury that he had been involved in organizing and participating in a college-sponsored demonstration on the effects which drinking has on the motor skills of drivers. The demonstration was conducted at various locations throughout the State. The subjects of the demonstration were television and radio personalities who volunteered to participate. Basically, the subjects were given progressively greater amounts of alcohol to drink, tested for blood-alcohol content and then, under supervision, sent to drive through a marked course. The demonstration revealed that after two drinks, with the exception of one or two individuals who were admitted heavy social drinkers, "there were deficits in their ability to perform on the course. Everyone, including the social drinkers, reported some perceptual differences."

Dr. Paul explained that various factors play a role in determining the effects which alcohol will have on an individual. Among these are the individual's age, height, weight, time and type of food ingestion, medications, and whether or not the individual was a regular drinker. He also stated that alcohol consumption has progressively more serious effects on an individual depending on the amount consumed. According to Dr. Paul, one of the first effects which alcohol has is altera-

tion in perception. Next comes loss of judgment. After that, an individual will experience motor and sensory impairment. He described this as difficulty with motor coordination, slurred speech, and stumbling.

Plaintiff's counsel asked Dr. Paul whether he thought that at the time of the accident defendant, as a result of drinking alcohol, had "an impairment, mentally or physically, which diminished his ability to think and act with ordinary care." Although the doctor had not personally examined defendant, he had been provided with certain facts concerning the case. He stated:

> "My opinion, based on my medical training, my experience in seeing a number of people in the Emergency Department with what I know were their blood alcohols are, and seeing their behavior, and with my pharmacology training, and as an addition, this demonstration, which was not the major basis for my determining my opinion is that there was, because of the alcohol ingestion, a significant degree of impairment, primarily in perception, on the time and date in question."

Dr. Paul further opined that at the time of the accident defendant was suffering from "a degree of intoxication from alcohol."

■ On this appeal, defendant first argues that the circuit court erred in allowing the admission of evidence which showed that he had been drinking prior to the collision. We disagree. To be sure, evidence that a person has consumed alcoholic beverages is not, by itself, admissible. There must also be proof of facts tending to show that the drinking resulted in intoxication. (*Taylor v. City of Chicago* (1983), 114 Ill. App. 3d 715, 717, 449 N.E.2d 272, 274.) In other words, a plaintiff

> "must bolster the probative value of the drinking with other evidence of the next step in the chain of causation, namely, actual impairment of physical or mental capabilities so as to diminish the defendant's ability to act with due care." *Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 237, 398 N.E.2d 1204, 1208.

Intoxication may be established directly through the testimony of the person who is drinking or circumstantially by evidence of erratic behavior by the driver, bizarre or unusual driving patterns, or through opinion testimony. (80 Ill. App. 3d at 237, 398 N.E.2d at 1208; *Taylor v. City of Chicago* (1983), 114 Ill. App. 3d 715, 717, 449 N.E.2d 272, 274.) Expert testimony is, of course, one form of opinion testimony, and it was through the expert testimony of Dr. Paul that plaintiff here sought to prove that given defendant's height, weight, age, food

intake, and other factors, his consumption of the two bourbon high-balls rendered him intoxicated.

■ While we have found no case law in this State which discusses the use of expert testimony to establish intoxication under circumstances analagous to those in this case, we note that chemical blood-alcohol test results are now recognized as a proper means of proving intoxication in personal injury actions. (See *Burris v. Madison County* (1987), 154 Ill. App. 3d 1064, 1069, 507 N.E.2d 1267, 1270; *Thomas v. Brandt* (1986), 144 Ill. App. 3d 95, 101, 493 N.E.2d 1142, 1146.) As plaintiff has correctly observed in his brief:

"When considered in its proper perspective, plaintiff's proposed expert testimony here is not materially different than the result of a blood alcohol test. The only real basis for admission of the outcome of the chemical test lies in the fact that scientists and other experts have determined that a certain blood alcohol level correlates with what we know as intoxication; indeed, the raw numbers produced by a breathalyzer machine have no significance apart from expert analysis of what they mean. The law cannot tolerate the incongruous result of allowing intoxication to be inferred from how experts not present in court have determined what blood alcohol tests mean, while at the same time disallowing the testimony of an expert, present for cross-examination, that a certain amount of alcohol in a given situation produces intoxication."

■ Defendant argues, in the alternative, that Dr. Paul's testimony should not have been allowed because his opinion was based on false factual assumptions and unreliable data. In our view, however, these matters go simply to weight and credibility of the evidence, and the expert testimony foundation rule established by our supreme court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, was available to permit Dr. Paul to give his opinion to the jury. See *Burris v. Madison County* (1987), 154 Ill. App. 3d 1064, 1070, 507 N.E.2d 1267, 1271.

Defendant was, of course, free to show the defects in Dr. Paul's analysis, and he vigorously attempted to do so. These efforts ranged from calling an employee of Charlie's Restaurant to challenge Dr. Paul's assumption as to the amount of alcohol in the highballs defendant consumed there, to adducing his own expert, the chief medical examiner for St. Louis County, who opined, *inter alia*, that defendant's driving ability was not impaired by alcohol at the time of the collision. While this testimony certainly challenged the validity of Dr. Paul's

opinion, it did not render what he had to say inadmissible.

■■ Defendant next asserts that he is entitled to a new trial because the impeachment of John Ballentine by plaintiff's counsel was improper. Under Illinois law, a witness' prior conviction can be used in a civil suit to impeach that witness' credibility. For a conviction to be used in this way, it must be for a crime punishable by death or imprisonment in excess of one year, or for a crime involving dishonesty or false statements, regardless of the punishment. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 1082, 510 N.E.2d 1162, 1170.) In this case, the crime used to impeach Ballentine's credibility was disorderly conduct for having filed a false police report in violation of section 26—1(a)(4) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 26—1(a)(4)). Although this crime was only a misdemeanor, there is no dispute that it involved "dishonest or false statements" within the meaning of the foregoing rule. As we have noted, Ballentine admitted, on cross-examination, that he had been convicted of the crime.

■■ ■ The problem with the impeachment here was that Ballentine's admission was incorrect. In fact, defendant's counsel was eventually able to prove that Ballentine had not been convicted of the offense, but instead had been placed under court supervision, which he completed successfully. Our supreme court has held that the successful completion of a period of supervision does not result in a conviction and therefore is not a proper basis for impeachment. (*People v. Schuning* (1985), 106 Ill. 2d 41, 48, 476 N.E.2d 423, 426.) As a result, if the true circumstances surrounding the disposition of the charge against Ballentine had been known in advance, it could not have been used to impeach his credibility. Defendant's attorney did ask the court to require plaintiff to make a preliminary showing as to the nature of the charge and its disposition before cross-examination proceeded, but that request was denied. Because the court refused to compel plaintiff to disclose these matters in advance, defendant asserts that he is entitled to a new trial.

We cannot accept this argument. There is no suggestion in the record that plaintiff's attorney knew that Ballentine had not, in fact, been convicted of the charge when he asked Ballentine about it. The documentary evidence which he had in his possession regarding disposition of the charge was, at best, ambiguous. Defendant's counsel, himself, was unaware of the actual circumstances surrounding the charge until he conducted his own investigation and uncovered additional documentation after the impeachment had already taken place.

To be sure, the decision by plaintiff's counsel to proceed with the

impeachment of Ballentine without more definitive documentary proof was a highly risky trial tactic. Had Ballentine denied the conviction, the trial may have been irreparably tainted. Nevertheless, we are not willing to reverse based on what might have been. Plaintiff's attorney was not obligated to lay a documentary foundation before eliciting the fact of Ballentine's conviction on cross-examination (see *Wilson v. Attaway* (11th Cir. 1985), 757 F.2d 1227, 1244), and we have found no authority which would require the preliminary showing demanded by defendant.

That defendant's witness made the error he did was unfortunate, but defendant cannot now be permitted to exploit that mistake to gain an advantage in this litigation. As we have just suggested, obtaining an admission by Ballentine on cross-examination was a proper means of establishing the fact of his conviction. Once this evidence of the conviction was before the jury, all that could be done was to permit defendant to adduce other evidence to refute it and to allow him to try to show that the circumstances surrounding the charges against Ballentine did not necessarily bear on Ballentine's veracity in this case. Defendant was given this opportunity, and he used it fully. We therefore cannot say that reversible error was committed.

Defendant next argues that the circuit court erred in allowing the police officer who investigated the collision to give opinion testimony regarding how fast plaintiff was traveling when defendant ran into him. In support of this claim, defendant simply makes the conclusory assertion that the testimony was irrelevant, speculative, and inflammatory and constituted hearsay. Of the various cases cited by defendant on this question, only *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 392 N.E.2d 1, involved circumstances comparable to those present here.

In *Peterson* our supreme court held, *inter alia*, that non-eyewitness reconstruction testimony should not have been admitted concerning the speed of an automobile where eyewitness testimony had been presented and resolution of the factual issue involved, the speed of the automobile, did "not require a scientific knowledge beyond that of typical jurors." (76 Ill. 2d at 359, 392 N.E.2d at 3.) Assuming, *arguendo*, that the opinions elicited from the investigating officer here constituted such reconstruction testimony, we do not believe that defendant is entitled to a new trial. The admission of expert testimony concerning a vehicle's speed does not automatically result in reversible error in every case. (*Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 448, 461 N.E.2d 64, 69.) As a general rule, new trials can be ordered only when the evidence improperly admitted appears to have

affected the outcome. *J. L. Simmons Co. v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 115, 483 N.E.2d 273, 277.

■ In the matter before us, plaintiff denied that he was traveling at an excessive rate of speed, and the investigating officer's testimony did tend to bolster this claim. Nevertheless, the jury also heard testimony that plaintiff, himself, had previously admitted to going too fast, and the jury's finding that plaintiff was 40% at fault indicates that they believed that he was, in fact, speeding when he was hit by defendant's car. Under these circumstances, we fail to see how the admission of the police officer's testimony, even if improper, resulted in prejudice to defendant.

■ Finally, defendant asserts that the circuit court committed multiple errors in instructing the jury. Four specific problems are cited. First, defendant contends that the court erred in submitting plaintiff's instruction No. 20 and in refusing to submit defendant's tendered instruction No. 10. Plaintiff's instruction No. 20 set forth the provisions of section 11—902 of the Illinois Vehicle Code (Ill. Rev. Stat. 1985, ch. 95½, par. 11—902), governing who has the right-of-way when a vehicle makes a left turn at an intersection, and it did so in the manner set forth in Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971) (hereinafter IPI Civil 2d). Defendant's tendered instruction No. 10 was a nonpattern instruction which sought to qualify the left turn statute in terms of speed and distance. Because plaintiff's instruction No. 20 was a pattern instruction which, in our view, accurately stated the law, the trial court was under a duty to submit it. *Piper v. Moran's Enterprises* (1984), 121 Ill. App. 3d 644, 654, 459 N.E.2d 1382, 1390.

■ Second, defendant argues that the circuit court erred in failing to submit his tendered instruction No. 4, which raised a claim by defendant that plaintiff was contributorily negligent because he "[d]rove his motorcycle at an unreasonable speed with regard to traffic conditions." This argument has no merit. It is error to give instructions where there is no evidence on which to base the instructions. (*Black v. Peoria Marine Construction Co.* (1987), 160 Ill. App. 3d 357, 365, 513 N.E.2d 622, 627.) The jury was instructed that plaintiff may have been contributorily negligent by reason of speeding, but there was no evidence that plaintiff was driving at or under the speed limit, yet still too fast for conditions.

■ Third, defendant asserts that the circuit court should not have submitted various instructions tendered by plaintiff regarding intoxication. In support of this argument, defendant merely restates his claim that plaintiff failed to adduce competent evidence that defend-

ant was, in fact, intoxicated. As we have previously discussed, however, evidence of defendant's intoxication was properly admitted. These instructions were therefore likewise proper.

Finally, defendant challenges the decision by the circuit court to submit plaintiff's instruction No. 20A. That instruction, framed in accordance with IPI Civil 2d No.60.01, set forth the provisions of section 11—501(a)(4) of the Illinois Vehicle Code (Ill. Rev. Stat. 1985, ch. 95½, par. 11—501(a)(4)), which prohibits a person from driving or being in actual physical control of a vehicle while "[u]nder the combined influence of alcohol and any other drug or drugs to a degree which renders such person incapable of safe driving." Defendant claims that it was error to submit this instruction because the statutory provision cited therein did not take effect until after the collision. Defendant did not, however, object to the instruction on this basis at trial. Objections to instructions on grounds not asserted at the instruction conference are not well taken. *Zieger v. Manhattan Coffee Co.* (1983), 112 Ill. App. 3d 518, 538, 445 N.E.2d 844, 858.

Defendant further challenges this instruction on the ground that no evidence was presented to show that defendant was under the influence of any drug at the time of the collision. This is simply not so. As our summary of the evidence indicated, defendant was taking a drug containing serpasil, which can cause sedation and slow reaction time. While Dr. Paul's testimony did indicate that the drug was inconsequential in terms of the effects which alcohol had on defendant's system, there was certainly a sufficient basis upon which the jury could have concluded that use of the drug itself impaired defendant's ability to drive safely.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

WELCH and LEWIS, JJ., concur.