MALISIE  TUCKER,  Plaintiff-Appellant  and  Cross-Appellee,  v.  ILLINOIS POWER  COMPANY,  Defendant-Appellee and Cross-Appellant.

Fifth District   No. 5—90—0214

Opinion filed July 17, 1992.—Rehearing denied August 25, 1992.

18

Marc P. Weinberg, of Goldenhersh Law Offices, of East St. Louis, for appellant.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (Carl H. Lee and Gregory M. Skinner, of counsel), for appellee.

JUSTICE WELCH delivered the opinion of the court:

Malisie Tucker's suit against Illinois Power Company (Illinois Power) alleged ordinary negligence, willful and wanton misconduct and a violation of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 1 et seq.), because of an interruption of natural gas service to Tucker's residence on or about January 29, 1985. The jury returned a verdict of $5,000 compensatory damages for Tucker. The trial court directed a verdict for defendant on the punitive damages count. Tucker filed a post-trial motion and a motion to tax attorney fees and costs against the defendant. The trial court denied Tucker's post-trial motion but allowed Tucker's motion to tax attorney fees and costs in the amount of $1,666.67.

Tucker appealed and raised as her first issue the question of whether the trial court erred in denying her motion for a mistrial at the close of jury selection. Tucker's motion was based on the contention that the principles of Batson v. Kentucky (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, apply to civil cases and Illinois Power used its peremptory challenges to discriminate against blacks. The trial court denied Tucker's motion for mistrial, but it made no express finding as to whether Tucker had presented a prima facie case of purposeful discrimination in the selection of the jury. This court, following the lead of Edmonson v. Leesville Concrete Co. (1991), 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077, which applied Batson to civil proceedings, remanded the cause to allow the trial court to conduct a hearing to determine whether there was a violation of the Batson principles. (Tucker v. Illinois Power Co. (1991), 217 Ill. App. 3d 748, 577 N.E.2d 919 (hereinafter referred to as Tucker I).) The trial court conducted a hearing and certified that no violation of Batson occurred in the jury selection of this case. Assuming a prima facie case was established, the record reveals that the trial court did not require Illinois Power to provide race-neutral reasons behind each of its peremptory challenges, and the trial court made no finding as to whether the explanations given by Illinois Power were sufficient to overcome a prima facie case of discrimination.

■ The first issue for our review concerns the trial court's finding that there were no violations of the principles of *Batson*. Once again, the record contains no explicit finding that Tucker established a *prima facie* case of discrimination. To determine whether purposeful jury discrimination has occurred, the trial court should first determine whether a *prima facie* case has been established before requesting the opposing party to articulate race-neutral reasons for its peremptory challenges. (*Batson*, 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-23; see also *People v. Andrews* (1992), 146 Ill. 2d 413, 588 N.E.2d 1126.) Although the trial judge should have followed the analytical guidelines of *Batson*, we will not disturb the court's implicit finding of a *prima facie* case and assume instead the presumption that a *prima facie* case was made. See *People v. Baisten* (1990), 203 Ill. App. 3d 64, 76, 560 N.E.2d 1060, 1067.

Our conclusion is not based solely on the court's invitation to Illinois Power to give its race-neutral reasons, although the invitation implied that the court found that a *prima facie* case had been established. A conclusion based on that ground alone has been criticized by the supreme court. (*People v. MaHaffey* (1989), 128 Ill. 2d 388, 414, 539 N.E.2d 1172, 1184.) In this case we choose not to disturb the trial court's implicit finding of a *prima facie* case where a *prima facie* case has been demonstrated.

A *prima facie* case may be established by showing that:

> (1) the plaintiff belongs to "a racial group capable of being singled out for differential treatment," *i.e.*, "a cognizable racial group"; (2) the State removed members of the plaintiff's race from the venire by using peremptory challenges; and (3) these facts "and any other relevant circumstances raise an inference" of purposeful discrimination because of race. (*Batson*, 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-23.)

In this case the plaintiff is a member of a cognizable racial group, and members of that racial group were peremptorily excluded from the jury by the defendant. As for other relevant circumstances which tend to raise an inference of jury discrimination, a markedly disproportionate use of strikes against black venire members was established.

Of the 27 members of the venire remaining after five members were excluded for cause, five were black. Each party was given five peremptory challenges. Illinois Power used four of its five challenges to remove blacks.

Another circumstance relevant to the query of jury discrimination involves the questions posed to one of the black venire members and

his response. The only information relative to venire member Darius Howlett elicited during *voir dire* was that he is a single, 19-year-old male who lives in East St. Louis, Illinois, and works as a cashier and stockman at a grocery store. In light of the cursory information provided by this prospective juror, it is not clear that a nondiscriminatory purpose was the reason for excluding him.

Based on the record, we will not disturb the trial court's implicit finding that a *prima facie* case of racial discrimination in selection of the jury was established. Once a complainant makes a *prima facie* showing of jury discrimination, the burden shifts to the opposing party to come forward with race-neutral explanations for challenging members of the venire who belong to the racial group in question. (*Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *Edmonson*, 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077; see also Puiszis, *Edmonson v. Leesville Concrete Co.: Will the Peremptory Challenge Survive Its Battle With the Equal Protection Clause*, 25 J. Marshall L. Rev. 37 (1991).) Illinois Power has the burden to articulate clear and reasonably specific explanations for its use of peremptory challenges of black venirepersons. See *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357.

At the hearing on remand, the trial court permitted both parties to argue, present testimony and cross-examine witnesses. The attorney for Illinois Power, Carl Lee, testified concerning the racial composition of the parties and the witnesses to this case. Lee testified that the plaintiff is a black woman. Glenn Tamens, a black man who is a representative of Illinois Power, sat with attorney Lee at the counsel table throughout the trial. Attorney Lee pointed out that of the principal witnesses called by Illinois Power, four were black. Attorney Lee testified that he wanted the trial court to be reminded and the appellate court to be made aware that this case is not one where there are black persons on one side and white persons on the other. The plaintiff's attorney objected to Lee's testifying as to the racial make-up of the parties and witnesses. The trial court overruled his objection.

■ A trial court is entitled to consider counsel's statements concerning the race of excluded venirepersons at a *Batson prima facie* hearing. (*People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025.) In deciding whether the complaining party has made the requisite showing of purposeful discrimination in jury selection, the trial court should consider all relevant circumstances. (*Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077.)

We cannot conclude that the testimony regarding the racial composition of the parties and witnesses was irrelevant, nor can we find that the trial court erred in overruling plaintiff's objection to the admission of such testimony.

We now turn to the question of whether the trial court erred in finding that Illinois Power's race-neutral explanations were sufficient to overcome Tucker's *prima facie* case of purposeful discrimination. The black venire members peremptorily challenged by Illinois Power are L.V. Watson, Irene White, Havie Eades and Darius Howlett. Counsel for Illinois Power testified that he challenged juror Watson because Watson was a patient of Tucker's treating physician, Dr. Frazer, and counsel was concerned that Watson would give greater credence to Dr. Frazer than to defendant's expert witness. It was revealed that Watson had not seen Dr. Frazer for nearly 20 years.

Attorney Lee testified that Irene White was employed by the Lovejoy Community Action Program and was at one time a Brooklyn Senior Citizens executive director. Lee believed that, because of her background, White would sympathize with the plaintiff, a senior citizen. Lee also had information that Illinois Power had once disconnected White's gas service, and Lee believed that this would prejudice White against Illinois Power.

Juror Eades, a 41-year-old man with a fifth-grade education, was challenged because he was the least educated of the jury panel. Illinois Power's attorney testified that he wanted a more highly educated group on the jury than someone of Mr. Eades' educational experience. Attorney Lee pointed out that the jurors challenged by the plaintiff's attorney were the most educated of the lot. Lee testified that another reason he challenged Eades was because, after reviewing Illinois Power's customer list, he had no record of Eades even though Eades was married and lived in East St. Louis. Lee's concern with what he did not know about Eades gave him discomfort.

Attorney Lee challenged 19-year-old juror Howlett because he was a young male. Lee testified that he also challenged juror Buhr, a 22-year-old white male, for the same reason. Lee testified that it is his opinion that young males are more apt to render higher verdicts than young females or older persons.

■ Defense counsel's explanations for challenging the jurors need not rise to the level necessary to justify a challenge for cause; however, they must be more than mere assertions of good faith or lack of discriminatory motive. (*People v. Baisten* (1990), 203 Ill. App. 3d 64, 77, 560 N.E.2d 1060, 1068.) The trial judge is in the best position not only to observe the behavior of the prospective jurors but also to eval-

uate counsel's sincerity; therefore, the trial judge's determination is entitled to great deference and will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360; *People v. Baisten* (1990), 203 Ill. App. 3d 64, 560 N.E.2d 1060; *People v. Dukes* (1992), 227 Ill. App. 3d 988.) In the instant case the trial court offered no commentary as to the reasons for its decision; it merely concluded that there was no violation of *Batson*. We conclude that the evidence supports the trial court's decision that there was no systematic exclusion of venire members based on race.

Tucker next argues that the trial court erred in not finding that Illinois Power violated the *Batson* principles because Illinois Power admits that it struck venireperson Howlett because he is a young male. The attorney for Illinois Power testified that he challenged venireman Howlett and venireman Buhr because they are aged 19 and 22, respectively, and it is his opinion that young males are more apt to render higher verdicts than young females or older persons. Tucker argues that *Batson*'s prohibition against racial discrimination extends to gender and age discrimination; therefore, pursuant to Illinois Power's admission, a *Batson* violation occurred.

█ Tucker cites no authority applying *Batson* to age discrimination. Even if we assume that *Batson* is applicable to gender and age discrimination, we need not decide whether purposeful age discrimination occurred here because Tucker waived this argument.

During *voir dire* and in her post-trial motion, Tucker vehemently asserted that Illinois Power committed purposeful racial discrimination. Not until after the *Batson* hearing was conducted in this case did Tucker raise the issue of age discrimination. The theory upon which a case is tried in the lower court cannot be changed on review, and the issue not presented to or considered by the trial court cannot be raised for the first time on review. (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 230, 552 N.E.2d 973, 978; *Ayers v. Bituminous Insurance Co.* (1981), 100 Ill. App. 3d 33, 36, 424 N.E.2d 1316, 1318.) An appellate court should not consider a theory not pursued below if proof might have been offered to refute or overcome such theory had it been presented. (*Protestant Hospital Builders Club v. Goedde* (1981), 98 Ill. App. 3d 1028, 424 N.E.2d 1302.) Had Illinois Power been aware of the allegation of age discrimination during the proceedings below, it might have been able to prove that its challenges of Howlett and Buhr were not age-discriminatory.

The final issue regarding *voir dire* is whether the trial court erred in not granting Tucker a new trial because Illinois Power utilized its

customer service list during the juror selection process. Specifically, the attorney for Illinois Power testified at the *Batson* hearing that he used the list in order to determine which jurors were customers of Illinois Power and which ones were customers prior to being disconnected for some reason. Tucker argues that this information was never made available to the court or to the plaintiff and directly bore on the integrity and veracity of the venirepersons. Tucker contends that, as a result of the failure to disclose this information, some of the jurors who should have been stricken for cause may not have been. Illinois Power argues that the information at issue is attorney work product and is not subject to disclosure.

■ Without delving into the issue of whether or not the information requested is work product and is otherwise privileged from discovery, the record demonstrates that Tucker at no time requested the customer service list or any related information from Illinois Power. It is within the trial court's discretion to make the final determination with respect to discovery orders. (*Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 502 N.E.2d 315.) It is curious that Tucker made no attempt to acquire the customer service list or any information which Illinois Power intended to use during *voir dire*, even though Tucker argues that she is entitled to such information. Based on the record we cannot find that the trial court abused its discretion.

Before turning to the remaining issues, it is necessary to relate the facts of this case in more detail. Bennie Hamilton, the plaintiff's daughter, testified that she has a close relationship with her mother and that prior to January 29, 1985, she visited her mother three or four times a week. Hamilton testified that at the time of the incident in question, Hamilton's sister, Tanner Conley, and James Lee, a companion of Malisie Tucker, lived with her mother. On January 29, Tucker and Conley had spent the day at Hamilton's house tending to Hamilton's children while she was at the hospital with an older sister whose husband was having surgery. Tucker and Conley left Hamilton's house soon after she returned from the hospital at 6:30 p.m. James Lee drove the two women to Tucker's home as neither Tucker nor Conley know how to drive. At approximately 10:30 or 11 that same evening, the three returned to Hamilton's home because the natural gas service to Tucker's home was not working. The temperature that evening was below freezing, and it was sleeting and snowing.

Hamilton testified that when Tucker, Conley and Lee returned to her home that evening her mother complained that she was "half

froze, and I never [sic] had such pain in my hands and arms before and my feet. Feel [sic] just like I don't have no feet." Hamilton telephoned Illinois Power and advised them that the gas service at her mother's home "had been turned off or was froze up." Hamilton observed that her mother's hands were pale and blue in color.

Malisie Tucker testified that she was born in 1910. On the night of the incident, she left Hamilton's house with Conley and Lee and returned to her own home to find that the heat was not working. Tucker testified that she called her landlord, Wardell Patterson, who lived next door, in an attempt to remedy the situation. Although Patterson tried to contact Illinois Power, Tucker did not personally call Illinois Power. After some time Patterson told Tucker to leave the house because the gas meter was not on. Tucker could not remember exactly how long she waited before she left with Conley and Lee to return to her daughter's home; however, she testified that they left at approximately 10 p.m.

James Lee testified that sometime between 4 and 5 p.m. on January 29, 1985, he observed two men from Illinois Power working across the street from Tucker's house. He testified that he hollered to the men, "Don't you all cut that, boy." Lee asked the men why they were disconnecting the gas service and was told that they had orders to cut it off. Lee testified that he advised the men, "Our gas bill is paid up." The men said nothing to Lee but continued to work. Lee testified that shortly thereafter the house began to get cold and Malisie Tucker told Lee to take her and Tanner Conley to Hamilton's house. Lee estimated that from the time he first noticed the Illinois Power men working until the time Tucker, Conley and he left the house, approximately 20 minutes or more passed. The drive to Hamilton's house took approximately 25 minutes.

Larry Jacob, a pipefitter for Illinois Power, testified that on January 29, 1985, he was given orders to disconnect the gas service for a residence located at 712 North 59th Street in East St. Louis, Illinois. Jacob testified that the gas service was disconnected at approximately 1:30 p.m. As a result of that disconnection, the service to 704 North 59th Street, Malisie Tucker's residence, was also disconnected. Jacob testified that he was not given the proper schematic showing the layout of the gas pipes and, therefore, was not aware that the gas line connecting 712 North 59th Street branched over to Tucker's residence. It is the Illinois Power commercial office's responsibility to see that the proper schematic is given to the pipefitter. Jacob testified that neither he nor anyone else gave Malisie Tucker notice that gas service was going to be disconnected in the area.

Rod Van Dyke, another Illinois Power pipefitter, testified that he went with Larry Jacob to disconnect the gas service to 712 North 59th Street. Van Dyke testified that no one advised them not to disconnect the gas service while they were working in the area that morning. It was not until the following morning that Van Dyke and Jacob were told by their superiors that the disconnected gas line branched to 704 North 59th Street. Van Dyke testified that Illinois Power trucks are often equipped with radios so that employees may discuss work orders with supervisors if a question or problem arises. He testified that many times he has had occasion to use the radio to call the office to discuss a work order. Van Dyke explained that Illinois Power's policy was not to disconnect gas service to a residential customer when the weather forecast called for the temperature to fall below 32 degrees Fahrenheit. On the morning of January 30, 1985, Van Dyke reconnected the gas service to Tucker's residence.

Glen Tammons worked the night shift as an Illinois Power pipefitter, and his duties included reconnecting gas service and repairing gas leaks. On January 29, 1985, he received a call from the Illinois Power dispatcher advising him that someone at 704 North 59th Street had called at 7:26 p.m. to inform Illinois Power that there was no gas service at that address. The temperature at the time was freezing. Tammons testified that a gas leak takes priority over a service call to connect gas service because of the potential for an explosion. As there were gas leaks that needed repair that evening, he did not arrive at Tucker's residence until approximately 10:43 p.m. Upon his arrival he and an apprentice pipefitter, Eunice Arnold, were told by Tucker's neighbor and landlord that the occupants of 704 North 59th Street were staying with relatives and would not be back that evening. Based on this information Tammons' crew left the scene. Tammons testified that he will not reconnect gas to a house that has had the service interrupted without being able to get inside to check the appliances because of the potential for an explosion.

Calvin Randolph, assistant superintendent for Illinois Power, testified that prior to January 1985 Illinois Power was aware that gas service was sometimes terminated because branches to other lines are disconnected. Randolph agreed that it is not justifiable to terminate gas service to a customer when the temperature is 32 degrees or below. He explained that a proper schematic showing the layout of the gas lines should be in all customer files that may be affected by the gas line that is being disconnected. Randolph testified that to his knowledge no one at Illinois Power ever intended to discontinue gas service to Tucker's residence and that it is the policy of the company

that if a customer requests gas service to be reconnected when the weather is below freezing Illinois Power should do it, particularly if they had disconnected the gas in error.

Douglas Scott, gas-distribution superintendent for Illinois Power, testified that on January 29, 1985, Tucker's account with Illinois Power was paid in full and she had the right to have gas service to her home. He testified that it was the responsibility of the pipefitters and their supervisors to make sure that the service orders and the schematics which accompany them are as accurate as possible. Scott testified that as of 1971 Illinois Power had within its possession the proper schematic for the layout of the gas lines to 712 North 59th Street and the branch of 704 North 59th Street. He testified that the gas-service order given to the pipefitters on January 29, 1985, indicates that the workers were only to retire partial service. The gas service order which was admitted into evidence has a marked box indicating that the type of service required by the order is "branch" rather than a single or multi-type of service. Scott further explained that gas leaks take priority over situations where gas service is interrupted. On the night of the incident in question, Illinois Power had two gas leaks to attend to in addition to Tucker's "no gas" call.

The jury returned a verdict of $5,000 for Tucker. Plaintiff filed a post-trial motion and a motion for attorney fees and costs. The trial court denied plaintiff's post-trial motion but awarded Tucker $1,666.67 in attorney fees plus court costs.

Count II of Tucker's complaint sought punitive damages and alleged that Illinois Power intentionally, willfully and/or wantonly interrupted natural gas service to her residence. At the close of all of the evidence, the court struck count II and ruled that the facts and circumstances of the case did not warrant submitting the issue of punitive damages to the jury.

■■ We agree with the trial court for two reasons: (1) section 5—201 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 5—201), which allows an award of punitive damages where the utility company acts willfully in violating the Public Utilities Act or any rule, regulation or decision of the Illinois Commerce Commission promulgated thereunder, does not apply in the instant case where Illinois Power Company did not intentionally or knowingly violate any provision of the Act or rules or regulations promulgated thereunder; and (2) in any event, the evidence is insufficient to warrant an award of punitive damages where the evidence shows only that Illinois Power Company acted negligently, and not willfully, in temporarily disconnecting plaintiff's gas service to her residence.

While the trial court did not base its decision on the first of these reasons, finding that the Public Utilities Act did apply to the instant case, but based its decision as to punitive damages only on a finding that the evidence was insufficient to support a finding of willfulness, we may affirm on any basis which is supported by the record. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12.) Because the issue of the applicability of the Public Utilities Act to the case at bar was extensively argued in the trial court, we may base our affirmance on this ground as well.

Throughout the pendency of this proceeding, Illinois Power Company argued that section 5—201 of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 5—201), which allows an award of damages for a violation of any provision of that Act, does not apply to the facts of the instant case. That section provides:

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was willful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation.

In every case of a recovery of damages by any person or corporation under the provisions of this Section, the plaintiff shall be entitled to a reasonable attorney's fee to be fixed by the court, which fee shall be taxed and collected as part of the costs in the case." Ill. Rev. Stat. 1989, ch. 111²/₃, par. 5—201.

In her complaint against Illinois Power Company, plaintiff alleged that defendant had violated section 8—205 of the Act in that it intentionally and/or willfully and wantonly interrupted or terminated the natural gas service to plaintiff's residence when the National Weather Service forecasted that the temperature would be 32 degrees Fahrenheit or below, and that defendant violated section 8—202 of the Act in that it intentionally and/or willfully and wantonly failed to warn plaintiff that it was terminating or interrupting the natural gas service to her residence.

Section 8—205 of the Act provides:

"Termination of gas and electric utility service to all residential users *** for nonpayment of bills, where gas or electricity is used as the only source of space heating or to control or operate the only space heating equipment at the residence is prohibited,

1. on any day when the National Weather Service forecast for the following 24 hours covering the area of the utility in which the residence is located includes a forecast that the temperature will be 32 degrees Fahrenheit or below." (Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—205(1).)

Section 8—202 of the Act provides:

"Any public utility *** which furnishes electricity or gas for space heating shall, during the calendar months of November, December, January, February, and March:

(a) give written notice of its intention to terminate or cut off such service or supply for any reason, other than by request of the customer, to the customer." Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—202(a).

It cannot be disputed here that the termination of plaintiff's gas service was unintentional, unknowing and accidental. Illinois Power Company did not intend to terminate plaintiff's gas service and did not know, until notified by plaintiff's landlord, that it had done so inadvertently and accidentally.

Section 8—205 prohibits termination of gas service during the winter months only for nonpayment of bills. This necessarily implies that, in order to violate the statute, the termination must be intentional and knowing, for it requires that the utility have a specific purpose and reason for termination, *i.e.*, nonpayment of bills. By its own terms, section 8—205 does not prohibit termination of gas service in an emergency, in the event of theft, or by mistake.

Section 8—202 requires notice of the utility's *intention* to terminate gas service during the winter months. It seems obvious that where there is no intention to terminate, as where the termination is accidental and unknowing, there can be no prior notice.

Thus, a plain reading of the sections of the Act involved here demonstrates that these sections address themselves only to intentional and knowing termination or interruption of gas service. Where the termination or interruption of gas service is accidental, unintentional and unknowing, there is no violation of the Act, and section 5—201, which provides for an award of damages, does not apply. Only violations of the Act or a rule or regulation promulgated thereunder are actionable under section 5—201 of the Act. *Barthel v. Illinois*

*Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 219, 384 N.E.2d 323, 326.

Our interpretation of the statute is supported by well-known principles of statutory construction. It is a primary rule of statutory construction that the intention of the legislature should be ascertained and given effect. In doing so, one must first look to the language of the statute itself, giving it its plain and ordinary meaning, as the statutory language is the best indication of the drafters' intent. Where the intent can be ascertained from the statutory language, it must be given effect without resorting to other aids for construction. A court may not declare that the legislature did not mean what the plain language of the statute imports. *People v. Bryant* (1989), 128 Ill. 2d 448, 455, 539 N.E.2d 1221, 1224.

The Public Utilities Act is in derogation of the common law and, as such, is to be strictly construed in favor of those sought to be subjected to its operation. (*Barthel*, 74 Ill. 2d at 220, 384 N.E.2d at 327.) Thus, the statute is to be strictly construed in favor of the utility company. The courts will read nothing into such a statute by intendment or implication (*Barthel*, 74 Ill. 2d at 220, 384 N.E.2d at 327), and such statutes will not be extended any further than what the language of the statute absolutely requires by its express terms or by clear implication. *In re W.W.* (1983), 97 Ill. 2d 53, 57, 454 N.E.2d 207, 209.

The sections of the statute in question here by their own terms prohibit termination of gas service during the winter months without prior notice and where the reason is for nonpayment of bills. As such, they require that the termination be intentional and not accidental. Because the statute is in derogation of the common law, it is to be strictly construed in favor of the utility company, and we may not expand upon its terms or language. Accordingly, we find that where, as here, there has been no violation of the Public Utilities Act, section 5—201 of that Act does not authorize an award of punitive damages.

Nor, as the trial court found, is plaintiff entitled to punitive damages under a common law theory of liability. The trial court found that the evidence did not support a finding that Illinois Power Company acted willfully and wantonly in accidentally and negligently terminating plaintiff's gas service. We agree.

The initial decision whether punitive damages may be imposed in a particular case is a matter normally reserved to the trial judge. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401.) Submission of the issue of punitive damages to the jury rests within the trial court's discretion, and that decision will not be

disturbed absent an abuse of that discretion. *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 580, 491 N.E.2d 464, 483.

Punitive damages are not favored in the law. Thus, they are awarded only when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Loitz*, 138 Ill. 2d at 414-15, 563 N.E.2d at 402.) Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence. Punitive damages are appropriate only for conduct involving some element of outrage, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. (*Loitz*, 138 Ill. 2d at 415-16, 563 N.E.2d at 402.) Willful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it. (*Loitz*, 138 Ill. 2d at 416, 563 N.E.2d at 402.) To establish willful and wanton conduct, a plaintiff must prove the defendant's intent to inflict injury or a callous disregard for whether injury will occur. *In re Salmonella Litigation* (1990), 198 Ill. App. 3d 809, 817, 556 N.E.2d 593, 599.

Without again discussing the facts already set forth herein, we find that they do not support the submission of the issue of punitive damages to the jury. The evidence indicates that the mistake of Illinois Power Company in inadvertently disconnecting plaintiff's gas service constituted ordinary negligence and not willful or wanton conduct. We do not think the evidence demonstrates that defendant acted with actual or deliberate intention to harm or with utter indifference to or conscious disregard for the rights of plaintiff. Accordingly, we affirm the trial court's decision not to submit the issue of punitive damages to the jury.

We point out that, even had we found that the Public Utilities Act did apply to the case at bar, we would have affirmed the decision of the trial court not to submit the issue of punitive damages to the jury. Section 5—201 of the Public Utilities Act requires that, in order to award punitive damages, the trial court must find that the misconduct of the utility company was willful. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 5—201.) In the instant case, it was not.

■ At trial, after a verdict was rendered in favor of Tucker, she filed a motion for attorney fees based on an alleged violation of her rights under the Public Utilities Act. (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 77.) The trial court ruled that the Public Utilities Act is applica-

ble in this case and awarded Tucker attorney fees plus court costs. Because we have already held that section 5—201 of the Public Utilities Act does not apply to the unintentional and unknowing termination of plaintiff's gas service here, we find that the trial court erred in awarding plaintiff attorney fees under that section. Accordingly, we reverse that part of the court's order awarding attorney fees. Further, because we find plaintiff is not entitled to an award of any attorney fees, we need not address plaintiff's next argument that the trial court erred in calculating the amount of attorney fees it awarded plaintiff.

Tucker next argues that the trial court erred in allowing one of the defendant's witnesses to testify without establishing a proper foundation for his testimony.

At trial, Tucker's treating physician, Dr. Frazer, testified that he treated Tucker on January 30, 1985. Dr. Frazer's practice is located in East St. Louis, Illinois. On that date he found Tucker's hands and feet were swollen, red, and tender to the touch; her joints were swollen and pained. Dr. Frazer diagnosed her condition as "injury due to the cold, frostbite of the extremities, first degree." Following Dr. Frazer's testimony, Illinois Power called the director of the emergency room at St. Louis Medical Center, Dr. Ronnau.

Dr. Ronnau testified that he examined Tucker on September 29, 1989, and it was his opinion that she suffered from a number of diseases prior to the incident of January 1985: cardiovascular disease, bronchial pulmonary disease, renal impairment, liver sclerosis, tuberculosis, osteoarthritis, and peripheral vascular disease. He testified that the superficial frostbite Tucker suffered did not cause or aggravate any of these conditions. When asked on direct examination about his experience with cold-related injuries, Dr. Ronnau testified,

"I think we see more than the rest of the city put together. We see a number of frostbite injuries, hypothermia injuries, cold injuries, exposure injuries. I think we see more than the rest of the city because we are responsible for the indigent, and the indigent have more cold problems in the winter than others."

Plaintiff did not object to this testimony.

After plaintiff cross-examined Dr. Ronnau, the witness was asked on redirect whether there are any hospitals in the area that see more cold-related injuries than St. Louis Medical Center. Plaintiff objected to this question on the grounds that it lacked a proper foundation as there was no showing that the doctor had personal knowledge about the number of patients treated at other hospitals. The court overruled the objection and allowed the witness to answer the question.

Tucker argues that the admission of this testimony was prejudicial and denied her a fair trial because Dr. Ronnau's opinions related directly to the central controversy of the case, namely, the nature and extent of Tucker's injuries. Tucker argues that because Ronnau was the only witness to testify that Tucker did not suffer permanent and progressive damage as a result of the cold-related injury and that the hospital where he is on staff treats more cold-related injuries than the entire city, his opinion was given undue credibility. It is generally true that an expert's opinion based upon improper elements is incompetent and should be excluded or stricken upon proper motion; however, errors in rulings on the admissibility of evidence do not necessarily require reversal. *People ex rel. Department of Transportation v. Birger* (1987), 155 Ill. App. 3d 130, 507 N.E.2d 1321.

■■ During direct examination, Dr. Ronnau was permitted to testify without objection as to his opinion that St. Louis Medical Center treats more cold-related injuries than any other hospital in the city. Plaintiff did not delve into the basis for this opinion during cross-examination. During redirect examination Illinois Power's question to Dr. Ronnau regarding the number of patients treated at St. Louis Medical Center for cold-related injuries reiterated the question asked on direct examination. While the plaintiff's objection to lack of foundation appears well taken, we conclude that the court's overruling of the objection was not reversible error in view of the fact that the same testimony had already been adduced with no objection on direct examination of Dr. Ronnau.

The next issue for review is whether the trial court erred in allowing Illinois Power to argue comparative negligence to the jury. After all the evidence was presented, Tucker moved to dismiss Illinois Power's affirmative defense of comparative fault. The court granted the motion. During closing argument Illinois Power argued, over objection, that Malisie Tucker was not stranded in her cold house. He argued that Tucker could have gone to her landlord's house, she could have left her house sooner, or she could have used James Lee's heated car. Tucker contends that the defendant should not have been permitted to make such arguments to the jury because the court had ruled that Tucker was not at fault.

■■ We cannot find that the trial court erred in allowing Illinois Power to argue comparative fault during closing argument because we find that the court erred in initially directing a verdict on the issue of comparative fault. "[A verdict] ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant

that no contrary verdict based on that evidence could ever stand."
(*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229
N.E.2d 504, 513-14.) Based on this standard the circuit court may
properly direct a verdict only when the evidence on an issue presents
no factual question for the jury's consideration. (*Rittenhouse v. Tabor
Grain Co.* (1990), 203 Ill. App. 3d 639, 646, 561 N.E.2d 264, 269.)
Sufficient evidence was presented to raise a factual question as to
Tucker's comparative fault. Evidence was presented at trial that the
plaintiff's injuries might have been mitigated had she gone to her
landlord's house for shelter, left her own home sooner than she did, or
returned to James Lee's heated car. Had the court not directed a ver-
dict as to comparative fault, the jury would have been invited to ap-
portion damages taking into consideration such evidence. Based on
the foregoing we cannot find that the trial court erred in allowing Illi-
nois Power to argue comparative negligence to the jury during closing
argument.

▪▪ The final issue is whether the trial court erred in refusing to
submit Tucker's tendered jury instruction number 21. The pertinent
portion of that instruction sets forth the provisions of section 8—205
of the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—
205). An instruction was given to the jury which set forth applicable
provisions of section 8—202 of the Act (Ill. Rev. Stat. 1989, ch. 111⅔,
par. 8—202). Tucker argues that because Illinois Power violated both
sections 8—202 and 8—205, instruction 21 should have been given to
the jury. Section 8—202 provides in part:

"Any public utility *** which furnishes electricity or gas for
space heating shall, during the calendar months of November,
December, January, February, and March:

(a) give written notice of its intention to terminate or cut
off such service or supply for any reason, other than by request
of the customer, to the customer." (Ill. Rev. Stat. 1989, ch.
111⅔, par. 8—202(a).)

Section 8—205 of the Act provides:

"Termination of gas and electric utility service to all residen-
tial users *** for nonpayment of bills *** is prohibited ***."
Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—205.

An instruction given by the trial court is justified if it is supported
by some evidence in the record, and the trial court has discretion in
deciding which issues are raised by the evidence. (*Friedman v. Park
District* (1986), 151 Ill. App. 3d 374, 390, 502 N.E.2d 826, 837.) In
this case there was no evidence that Tucker was delinquent in her
utility payments or that the interruption of her gas service was due to

her failure to pay her bill. On the contrary, the evidence established that Tucker's account with Illinois Power was current. It is error to give instructions where there is no evidence on which to base the instruction. (*Lively v. Kostoff* (1988), 167 Ill. App. 3d 384, 395, 521 N.E.2d 554, 562.) The trial court did not abuse its discretion in refusing to submit plaintiff's instruction number 21.

For the reasons cited herein, we: (1) reverse the trial court's award of attorney fees; (2) affirm the trial court's decision precluding the plaintiff from submitting the issue of punitive damages to the jury; and (3) affirm the trial court as to the other issues raised on appeal.

Affirmed in part; reversed in part.

CHAPMAN and RARICK, JJ., concur.